# CLARK *v.* REEDER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF WEST VIRGINIA.

No. 262. Argued April 22, 23, 1895. — Decided May 27, 1895.

C. contracted in writing in 1884 with R. to purchase from him about 50,000 acres of land in West Virginia, which had been originally granted by the Commonwealth of Virginia to D. in 1796, and which R. had acquired in 1870 from persons who had purchased it at a sale for non-payment of taxes, made in 1857, after the death of D. The contract was by the acre, at so much per acre. The title was to be examined by F., a lawyer of West Virginia, the attorney of C., and upon his certifying it to be good the first payments were to be made. The total number of acres within the defined limits were agreed to by both parties, but a further survey was to be made at the expense of C., in order to ascertain what tracts and how many acres within those limits were held adversely to B. under a possessory title. F. certified that the title was good, except as to sundry small tracts held adversely, and C. thereupon made the first payment under the contract. Partial surveys having been made, C. declined to carry out his agreements, and filed a bill in equity, setting up that there had been mutual mistakes as to the amount of the conflicting claims, and praying for a rescission of the contract. This bill was met by an answer denying that there had been such mistakes, and by a cross-bill. After sundry other pleadings, and after some evidence was taken, C. filed an amendment charging fraud upon R. and his agent, and setting up that the contract had been induced by fraudulent concealments and representations on their part. Further proof was taken, and a hearing below resulted in a decree in favor of R. In this court, after a careful review of the pleadings and proof, it is *Held,* That the Circuit Court was right in concluding that C. was not entitled to a rescission of the contract.

APRIL 16, 1796, a grant was made by the State of Virginia to Edward Dillon for 50,096 acres of land situated in what was then the county of Montgomery, but, at the time of the transactions involved in this case, partly in the counties of Wyoming, Boone, Raleigh, and Logan. The entry for the land was made April 23, 1795, it was surveyed May 28, 1795; and the land was known and spoken of as the Dillon survey or grant. In 1855, Dillon having died some time before, the land was sold for taxes and charges thereon, and at that sale

was purchased by Lawson and Ward, to whom a deed was made December 22, 1857, by the clerk of the county court of Wyoming County, under the statute. Lawson and Ward subsequently conveyed the land to Simpson, who conveyed to Cox, by whom it was conveyed to Charles Reeder in 1870, who was and always has been a citizen and resident of Maryland.

In 1873 Reeder caused a survey to be made of the Dillon tract by W. T. Sarver, a surveyor. At that time Reeder ascertained that there were a number of persons actually living upon portions of the land embraced in the Dillon survey, who claimed title to the land in their possession adverse to Reeder's title; the number of acres claimed by each being comparatively small. C. C. Watts of West Virginia had been acting as attorney and agent for Reeder in matters connected with the land for some years, when, on January 23, 1884, he obtained from Reeder an option to purchase it at the rate of two dollars per acre at any time before July 1, 1884. February 4, 1884, the previous agreement was modified so that if $25,000 was paid to Reeder in cash within thirty days from February 4, 1884, and an additional $1000 to reimburse him for certain outlays made by him, then the price of the land should be reduced from $2 to $1.50 per acre.

In the same month of January, Bell, acting as the agent of Clark, who was a resident of the city of Philadelphia, had entered into negotiations with Watts for the purchase of the land, in the profits of which purchase, if any, Bell and others were interested. These negotiations were commenced in Philadelphia, and resumed in West Virginia in February, 1884, and as a result thereof the following written contract was entered into on February 29, 1884, between Watts and Bell:

" Agreement made this 29th day of February, 1884, by and between C. C. Watts, of Charleston, W. Va., acting under an agreement in writing between himself and Charles Reeder, of Baltimore, Md., dated the 3d day of February, 1884, and as the agent of said Reeder, of the first part, and H. M. Bell, of Staunton. Va., acting as the agent of E. W. Clark, of Philadelphia, Pa., of the second part, witnesseth :

"That the party of the first part, acting as aforesaid, has this day sold to the party of the second part, acting as aforesaid, a certain tract or parcel of land lying and being in the counties of Boone, Logan, Wyoming, and Raleigh, in the State of W. Va., containing 50,096 acres, be the same more or less, which tract of land was granted by the Commonwealth of Virginia to Edward Dillon by patent bearing date on the 16th day of April, 1796, and is now claimed and owned by the said Charles Reeder by a regular chain of conveyances, the first being a tax deed for said land executed by the clerk of Wyoming County court to Evermont Ward and Anthony Lawson, bearing date the 22d day of December, 1857, executed, in pursuance of a sale thereof for taxes delinquent thereon in the name of the heirs of Edward Dillon, and the last to the said Reeder from C. C. Cox, dated the 27th day of August, 1870, and for a particular description of said tract of land reference is had to said patent; upon the following terms and conditions, to wit:

"First. Said sale of said land is a sale by the acre and not in gross.

"Second. The party of the second part is to pay for the said land at the rate of one dollar and seventy cents per acre, as follows: Thirty-five thousand dollars to be paid on the day on which James H. Ferguson, a practising attorney of Charleston, W. Va., shall certify the title of said Reeder to said land to be good and valid, which certificate is to be made within 30 days from this date; twenty-five thousand dollars of which sum is to be paid to the said Reeder, and the residue to said Watts. The balance of the said purchase money is to be paid to said Reeder on the 1st day of June, 1884, or as soon thereafter as the necessary surveying can be done to ascertain the quantity of land within the bounds of the said patent to which the said Reeder can make good title. It is understood that the party of the second part is satisfied with the survey already made by Wm. T. Sarver of the exterior bounds of said tract of land, and that the surveying to be done is only such as may become necessary to ascertain what lands within said boundary

are held by a better title than that of the said Reeder, by reason of adverse title and possession, all of which surveying is to be done at the expense of said party of second part.

"Third. When the last of the purchase money is paid, the said Reeder is to convey said land with covenants of special warranty to the said E. W. Clark, or to such person or persons as he may direct.

"Fourth. The balance of said purchase money, after the date of the certificate of said Ferguson, is to bear interest until paid.

"Fifth. In addition to said one $\frac{70}{100}$ dollars per acre, the party of the second part is to pay to said Reeder one thousand dollars as provided for in his contract with said Watts.

"Sixth. This contract is subject to the approval of said Reeder, and is to take effect from the date of such approval, but the same shall then be void if the certificate of said Ferguson is not made within the time specified.

"Witness the following signatures the day and year aforesaid.

"C. C. WATTS,

"H. M. BELL,

"Ag't for E. W. Clark.

"Approved March 4th, 1884.

"C. REEDER."

If the conditions of the agreement of February 4, 1884, (the date is given in the foregoing contract as February 3,) were not fulfilled, then the only option Watts had was under his agreement with Reeder of January 23, 1884, by which the price was to be $2 per acre, and by the terms of the agreement between Watts and Bell, Ferguson had thirty days from February 29, 1884, within which to pass upon the validity of the title, before the lapse of which time the option from Reeder to Watts to purchase at $1.50 per acre would have expired. The contract price in the contract of February 29 was fixed at $1.70 per acre, and the contract provided that $10,000, that is, twenty cents an acre on the basis of fifty thousand acres, of

the purchase money should be paid to Watts, and if the contract was approved by Reeder, the time for the payment of the $25,000, as provided by the option of February 4, would be extended. The contract of February 29, 1884, was taken to Baltimore by Watts and Bell, and on March 4, 1884, Reeder endorsed his approval thereon.

Ferguson drew the contract of February 29, 1884, as the attorney of Clark, and, acting under it, prepared and delivered a written opinion and certificate, dated March 22, 1884, as follows:

" Abstract of title to the following tract of land known as the Dillon survey.

" 1st.

" The Commonwealth of Virginia }
to
Edward Dillon. }

" Grant or patent for fifty thousand and ninety-six acres, situate in the then county of Montgomery, Virginia, but now principally in the counties of Boone, Raleigh, and Wyoming, in the State of West Virginia, dated April 16, 1796.

" The grantee, Edward Dillon, died some time previous to the year 1855, (it is not known just how long,) and the tract of land was entered on the land books of Wyoming County, where most of the tract is situated, in the name of Edward Dillon's heirs and charged with taxes in that name.

" The taxes so charged on said tract not being paid the land was returned delinquent, as required by law, for the non-payment of said taxes, and the same was sold as required by law in the year 1855 for the said taxes and the charges thereon and the costs of sale, at which sale Anthony Lawson and Evermont Ward became the purchasers of the entire tract of 50,096, and the owners of said tract of land failing to redeem the same within the time required by law the said Lawson and Ward obtained a deed therefor under the statute.

" 2d.

" Leroy B. Chambers, clerk of the county court of

Wyoming County,

to

Anthony Lawson and Evermont Ward.

" Deed bearing date the 22d day of December, 1857.

" This deed conveys to the said Lawson and Ward, the purchasers of said tract of land at said tax sale, the said tract of land and all the right, title, and interest of the heirs-at-law of Edward Dillon, dec'd, therein, but said deed is defective, and is not sufficient of itself to convey a good title to said tract of land to the grantees therein. It is, however, a good and sufficient color of title to ripen into a good and perfect title by possession of the land thereunder and the payment of the taxes thereon for a sufficient length of time.

" I have made a full and thorough examination and investigation of the matters pertaining to the title to this tract of land and find that as early as the years 1859 and 1860 the said Evermont Ward, acting for himself and said Lawson, placed tenants on said land under an agreement that said tenants should clear and cultivate as much thereof as they saw proper, and at such place or places thereon as they saw fit, and that they should guard and protect the whole of the said tract against trespassers, and that said tenants and others put on said tract of land by and under them have continued on said land as the tenants of said Lawson and Ward from that time to the year 1870, when Charles Reeder became the purchaser of said land, and from that time to this they have held and occupied the said land as the tenants of said Reeder, and still so hold and occupy the same. I also find that quite a number of other persons have held and occupied said land as tenants of Ward and Lawson and of said Reeder for more than ten consecutive years, some of them going back to 1864, and are still holding and occupying the same as the tenants of said Reeder.

" The said Reeder has paid all the taxes charged and chargeable on said tract of land from the date of his said purchase

thereof to the present time and has proper receipts therefor, and there are now no unpaid taxes on said land."

[The third muniment was a power of attorney, Ward to Lawson; the fourth, a deed from Lawson and wife and Ward to Simpson; the fifth, a deed from Simpson to Cox; the sixth, a deed from Cox and wife to Reeder dated August 27, 1870.]

"The deed of Chambers, clerk, to Lawson and Ward, of Lawson and wife and Ward to Simpson, of Simpson to Cox, and of Cox to Reeder are all of record in the office of the clerk of the county court of Wyoming County.

"There are no recorded liens of any sort on said tract of land in any of the counties in which the same is situate, and the said tract of land, so far as the records show, is free and clear of all incumbrances.

"The only title which can be found older than the Dillon patent is a grant from the Commonwealth of Virginia to Rutter and Etting, dated the 9th day of January, 1796. There is, from the best information I can obtain, a small portion of the Rutter and Etting survey embraced within the Dillon survey, but the Rutter and Etting survey was forfeited long prior to 1837, to the State of Virginia for the non-payment of the taxes thereon and for the non-entry thereof on the land books of the proper county, and was sold by the commissioner of delinquent and forfeited lands some forty or more years ago. At the time of that sale the taxes on the Dillon survey had always been paid, and for that reason the title to the whole thereof became good and valid, so far as the Rutter and Etting survey is concerned.

"In the year 1877 an act was passed by the legislature of the State requiring all tracts of land of — acres or more lying in different counties to be assessed for county and district taxation in the several counties and districts in which they were situate; and under this law, in the year 1880, the said tract was for the first time charged with taxes in the counties of Boone and Wyoming, as follows: 9000 acres in the county of Boone and the whole tract in the county of Wyoming, and the taxes were paid thereon as charged by said Reeder. In the year 1881 and since said tract of land was charged with taxes

in the counties of Boone, Raleigh, and Wyoming as follows.: 9000 acres in Boone, 5000 acres in Raleigh, and 41,096 acres in Wyoming, making in all 55,096, and said Reeder has paid the taxes so charged on that number of acres from that time to the present.

" There are, so far as I can ascertain without actually going over the whole tract, some 50 persons living on said tract, in part as tenants of said Reeder and in part as claimants of portions of said land. Just what number of acres these claimants can. make out a good title to it is, of course, impossible to tell, but 1 can say with almost a positive certainty that in view of the possession of the said tract by said Reeder and those under whom he claims for nearly 25 years the number of acres to which these junior claimants can make title will be but small comparatively.

" I do therefore certify that in my opinion the title of Charles Reeder to the said Dillon survey is good and valid, except as to such parts of said tract as may be affected by the claims of the occupants aforesaid, which may or may not be superior to the title of said Reeder."

This certificate having been delivered March 25, 1884, to Bell, the agent of Clark, the former drew two drafts on the latter at the city of Philadelphia; one for $10,000 in favor of Watts, and the other for $25,000 in favor of Reeder, and delivered them to Watts, who deposited and cashed his draft on that day, and forwarded the draft for $25,000 to Reeder. Both drafts were paid by Clark, and Ferguson's certificate was sent to him.

The record shows that a surveyor, M. A. Miller, was employed in the spring of 1884 for the purpose of ascertaining what number of acres within the exterior boundaries of the Dillon tract were held by persons who were in the actual possession thereof, claiming to hold them by title adverse to Reeder, but no report of the result of his survey was made to Reeder until some time in November, 1884. In this report Miller said : " There are a large number of small tracts, held under junior patents, lying within the Dillon survey, aggregating, approximately, 2500 acres. Most of these, perhaps all,

are held by occupant claimants who have had them in undisturbed, continuous possession, under their junior patent titles, for many years."

Reeder testified that : " This general statement of persons holding better title by reason of adverse title and possession is the only information looking to a compliance with that clause of the contract which relates to surveying that has been furnished to me by E. W. Clark or his agents, but no survey or exact determination, as the contract requires, has ever been furnished me." The report of Miller was dated October 29, 1884, and in it he set forth that a large part of the land embraced in the Dillon survey was embraced in the land covered by the grant made by the State of Virginia to Rutter and Etting, January 9, 1796, on an entry made by William Duval, May 13, 1795, for whom it was surveyed May 30, 1795. The report also contained the names of parties in possession, who claimed, or were supposed to claim, the title to portions of the land embraced within the interlock of the two surveys, under the Rutter and Etting title.

In the spring of 1885 Reeder applied to Clark to comply with the terms of the contract of February 29, 1884, which Clark declined to do.

August 1, 1885, Clark filed his bill of complaint in the Circuit Court of Boone County, West Virginia, against Reeder, which was subsequently removed on Reeder's application to the United States court for the District of West Virginia.

The bill alleged that at the time the agreement of February 29, 1884, was entered into, it was understood and believed by all the parties that the title of Reeder to much the greater part the land was good and valid, and that not more than ten thousand acres could be held by others than Reeder by any other claim or title whatever, and that it was with this understanding that complainant made the purchase and paid the $35,000; that upon a survey it was found to the great surprise of Clark that the entire Dillon survey, with the exception of about 5000 acres, was within the outlines of the Rutter and Etting patent; that the Rutter and Etting tract was claimed by a large number of persons asserting their title

to be superior to the title of Reeder, and that complainant could not safely pay any more of the purchase money under the contract while the cloud thus created hung over the title to the land ; that he had unsuccessfully endeavored to settle with Reeder; that he had offered to bring actions of ejectment against those claiming under the Rutter and Etting title in Reeder's name, and had asked Reeder to do so, but without avail; and that Reeder required him to pay for the whole number of acres after deducting the number of acres held by actual settlers, amounting to some five or six thousand acres, and to take the risk of the Rutter and Etting title, which he, complainant, had refused to do; that the contract was entered into by complainant without any knowledge of the conflict created by the Rutter and Etting patent, and that he believed Reeder was equally ignorant of any such conflict, and that the agreement was therefore the result of mutual mistake as to conflicting claims to the land which was the subject of the agreement; that he would not have entered into the agreement had he known of the existence of the conflict of title, at least until all questions as to such conflict had been settled and determined; and that he would not have paid the $35,000, or any part thereof, until such settlement; that Reeder derived his title mediately through a tax sale of the Dillon land, and there was a question as to the validity of the tax deed and the subsequent claim under it, and it was this claim that Ferguson was appointed to report on, it being understood by both parties that if this title was declared by Ferguson to be good, there was nothing in the smaller surveys aforesaid to interfere with the title of Reeder to the whole Dillon tract; hence it was stipulated in the agreement that Reeder was to convey the land to complainant with covenants of special warranty, complainant taking the risk of the Dillon title held by Reeder; that by reason of the older and apparently the better title complainant could not make his purchase available; and as he could not bring ejectment and Reeder would not, and especially in view of the mutual mistake before mentioned, complainant prayed a rescission of the contract and a repayment of the $35,000.

To this bill Reeder filed an answer and a cross-bill. The answer denied that when the agreement of February 29, 1884, was entered into there was any understanding other than or different from that embodied in the agreement itself, or that there was any understanding between the parties as to what number of acres might be held by others than Reeder, or what number might be excluded under the agreement. The claim of right of any person under the Rutter and Etting patent was denied, and it was averred that any title which might have once existed under that grant was long since forfeited, and it was further averred that complainant was advised to this effect in the certificate of opinion; and it was denied that the fact that there were persons who claimed under the Rutter and Etting title constituted any cloud on the title to the land purchased by complainant from defendant, or furnished any excuse for complainant's neglecting to carry out his contract. Defendant further averred that the contract of February 29, 1884, was entered into by himself and complainant with full knowledge that the whole question of title was to be passed on by Ferguson, complainant's selected attorney, before the money should be paid and before the contract should take any practical effect, and that one of the matters considered by the attorney and reported on by him was the supposed conflict of the Rutter and Etting patent with the Dillon patent, and this was before complainant paid any money under the contract; that complainant's agent was apprised of the supposed conflict, and that the Rutter and Etting patent had long since been forfeited. Defendant denied that it was the validity of his tax title that Ferguson was ordered to report on, but on the whole title; and declared that ample time was given by the agreement for the examination of all matters connected with the title, and if the examination did not show the title to be good, the agreement was to be null and void. Defendant admitted that he had refused to bring or authorized to be brought in his name any actions for ejectment against persons claiming title to the land, not only because this was no part of the agreement, but because, before the agreement was entered into, the agent of the complainant

was distinctly informed that defendant would not agree to bring any action of ejectment against any persons in possession of or claiming title to any portion of the land, and was distinctly informed before the agreement was entered into that defendant would convey the land with a covenant of special warranty only, the agreement expressly so providing. Defendant further stated that though he had demanded of complainant that he should ascertain by survey the number of acres within the boundaries of the Dillon tract, held by better title than that of Reeder by reason of adverse title and possession, complainant had altogether refused and failed to comply therewith; and defendant averred thereupon that he was entitled to have the land sold under the decree of the court for the payment of the purchase money. Defendant also denied that there was any mutual mistake in the execution of the contract.

The cross-bill averred that at the time the agreement of February 29, 1884, was executed, there were certain persons in possession of some portions of the land embraced within the boundaries of the Dillon tract, claiming title thereto under junior claims, and these persons, irrespective of the validity of their claims, Reeder was unwilling to disturb, and therefore the provision was inserted in the agreement that surveys should be made at the expense of Clark to ascertain the number of acres within the outlines of the tract which were held by a better title than that of Reeder by reason of adverse title and possession; and the cross-bill, after averring that Reeder had waited for more than a year before demanding payment of the balance of the purchase money, the amount of which could not be known until the survey had been made, yet that Clark had altogether refused and failed to furnish Reeder a list of the persons holding lands within the boundaries of the tract by better title than Reeder by reason of adverse possession and title, and had refused to pay the balance of the purchase money, alleging as a reason that claims were set up to some portions of the land, but not pretending that any person making such claim had better title than Reeder by reason of "adverse title and possession," prayed that a decree might be passed for a sale of the

land for the payment of the unpaid balance of the purchase money.

This cross-bill was filed May 5, 1886, and on May 14 Clark filed an amended and supplemental bill to the effect that one Rockey was cutting timber on a part of the land and should be restrained; and also that actions of ejectment should be brought against persons in possession of the land claiming adversely to Reeder; and asking for the appointment of a receiver or receivers. Before this bill was actually filed, the court directed an injunction against Reeder and appointed a receiver with directions to bring such suits as he should be advised to bring by counsel for Reeder or Clark against all persons holding or claiming to hold adversely to Reeder. On July 28, 1886, Reeder filed his answer to this supplemental and amended bill, objecting to the appointment of a receiver and moving for his discharge. Rockey also answered the bill and filed a number of exhibits with his answer. November 13, 1886, Clark filed his answer to the cross-bill of Reeder, restating the matters set forth in the original bill, and relying on them and the knowledge that the facts revealed by the Miller survey as to the Rutter and Etting title had been known to Reeder.

On December 4, 1886, Watts, who had been in the meantime made a party, filed his answer to the original and amended and supplemental bills of Clark, setting up substantially the same matters and things as those set forth in Reeder's answer and cross-bill, and also stating all the facts and circumstances connected with the making of the agreement of February 29, 1884, the furnishing of the certificate of opinion of Ferguson, and the payment of the $35,000 on March 25, 1884. Watts averred that during the negotiations between Clark's agent and himself leading up to the making of the contract, the fact of an interlock between the Dillon survey and the Rutter and Etting survey was made known by him to Clark's agent, though not knowing the extent of the interlock he did not state it; and he also said on the occasion of the payment of the $35,000 on March 25, 1884, the fact of this interlock was again the subject of conversation, and Clark's agent said that

in view of Ferguson's opinion this was immaterial. On February 19, 1887, Clark filed a second amended and supplemental bill, stating, in addition to the reiteration of the allegations of the original bill, that neither at the time of the execution of the contract or its approval by Reeder did Clark, his agent, or Ferguson, his counsel, know that there was any interlock between the Dillon and Rutter and Etting surveys, nor was any intimation given thereof by Reeder or Watts; that it was not until after the signing and approval of the contract and after an examination and investigation by Ferguson of the claims of the junior claimants and occupants and of the possession of the land by Reeder and by Ward and Lawson, his predecessors in the ownership thereof, that anything was said by Watts about the Rutter and Etting patent or its interference with the Dillon survey, and that when he did speak of it he spoke of it as a small and unimportant interference which would not seriously affect the land sold to Clark; that though Ferguson had for many years been acquainted with the Dillon survey and had always regarded it as good and valid and the title unquestionable, and had long known of the Rutter and Etting survey, and the sale thereof as forfeited for delinquent taxes by proceedings for the purpose, yet that he had never heard that the Rutter and Etting survey covered any portion of the Dillon survey, and the fact only came to his knowledge after the approval of the agreement of February 29, 1884, and after the examination and investigation aforesaid he, as far as was possible, looked into the matter and was satisfied that if there were any interference it was so small and unimportant as not seriously to impair the value of the Dillon survey even if it should prove a better title, and that in this belief he gave the information and opinion in regard to it, to be found in his certificate; that before the agreement was reduced to writing the whole matter was fully discussed, and it was the distinct understanding of Bell and Ferguson and of Watts, as they understood him, that the Dillon patent was the oldest patent covering all embraced within it, and that there would not be any adverse claim set up to any of the land except some junior grantee of some parts of the land,

which holdings would not exceed 5000 acres, and probably not be more than 2500, the quantity when ascertained to be deducted from the 50,096 acres, and it was to ascertain the number of acres so held that the survey mentioned in the agreement was provided for. This bill propounded certain interrogatories to Reeder and to Watts, as to their knowledge of the interference and its extent, and called for answers under oath. It was further averred that when the original bill was filed it was with the belief by Clark that Watts and Reeder were altogether ignorant when the contract was executed that the Rutter and Etting survey interfered with the Dillon survey, and therefore, he had alleged that there was a mutual mistake, but that if the existence of the Rutter and Etting survey and its interference with the Dillon survey had in any way come to the knowledge of Watts and Reeder, or if they suspected such interference, their failure to make known the interference before the contract was executed was a fraud on Clark, whether so intended or not, and made the contract null and void, and entitled Clark to a rescission thereof and the repayment of the $35,000.

On March 18, 1887, Reeder filed his separate answer under oath to this second supplemental and amended bill, and on March 19, 1887, Watts also filed his separate answer thereto likewise under oath. The answer of Reeder was that the whole question of title to the Dillon survey was to be passed on by Ferguson, and was so passed on by him; that whether Clark, his agent or attorney, did or did not know at the time of the execution of the agreement or its approval by Reeder of any interference by the Rutter and Etting survey was altogether immaterial, as the agreement specifically provided for a period of thirty days after the date of said contract, in which the counsel of Clark was to investigate the survey as to the validity of the title, and if he did not then report the title to be good and valid, the contract would be wholly void; the report of the attorney was that he was well aware of a conflict or interference between the two surveys, though not what may have been its extent; and thereupon, Clark was advised of the conflict or interference before he made any payment,

and if he had any objection to make to the title on that ground, he should have made it before making the payment; and, not having done so, it was now too late for him to make such a defence. That defendant had no knowledge of what representations were made at the time of the making of the contract; that he was not present and had no knowledge of what had taken place, and approved the agreement of February 29, 1884, when presented to him, relying on the terms thereof as embodying the contract between the parties. And he set forth the facts connected with his knowledge of the Rutter and Etting patent.

The answer of Watts specifically denied the allegations of the bill in reference to what took place at the time of the preparation of the agreement of February 29, 1884, and rehearsed all that did take place on this subject, reiterating the statement made in his previous answer that while he knew at the time the agreement was made that there was an interlock between the two surveys, he did not know the extent, and gave Clark's agent and Ferguson all the information he had on the subject.

After the filing of these answers, and after the testimony had been taken, Clark filed an amendment on November 26, 1887, under which he charged that both Reeder and Watts, at the time of the execution of the agreement, knew of the interlock between the two tracts, and nearly the extent of it, and fraudulently withheld such knowledge, and thereby fraudulently induced the agent and attorney of Clark to make the contract while they were in utter ignorance of the facts, and that Watts fraudulently represented that there was no older title at the time the contract was executed than the Dillon title to any of the land embraced in the latter patent, and that the only claim that could be set up adversely to the Reeder title would be under junior patents; and that Clark's agent and attorney entered into the contract believing the representations, which they would not otherwise have done; and that the contract was procured by said fraudulent concealments and representations.

The case was heard in the Circuit Court of the United

States for the District of West Virginia before Mr. Justice Harlan, acting under a special assignment for that circuit, and District Judge Jackson; and Mr. Justice Harlan filed an opinion, in which the District Judge concurred, October 31, 1889, which is reported in 40 Fed. Rep. 513.

On December 4, 1889, an interlocutory decree was entered making the opinion part of the record; referring the case to a special master to ascertain and report all the tracts of land, if any, within the exterior boundaries of the Dillon survey, as run by Sarver, which were shown to be in the possession of persons whose right thereto was better, by reason of adverse title and possession, than the title of Reeder; to indicate in the report all the portions of the land in the possession of the junior patentees holding by a better title than Reeder; and what lands, if any, within the survey so made by Sarver were also in the Rutter and Etting survey, held by a better title than that of Reeder, by reason of adverse title and possession.

The court reserved, until the coming in of the master's report, the question whether the matter of the title and possession of any one, whom complainant might allege to have a better right to any part of the lands than defendant Reeder, should be determined upon the proofs then in the case with such as might be submitted with the master's report, or should be determined by actions of ejectment. The master proceeded to discharge the duties imposed on him, and made a report of his findings and also a supplemental report, and thereupon, after exceptions by both parties to the reports, the court, on May 30, 1891, passed a final decree in the case. By this decree the court adjudicated that the contract contained in the agreement of February 29, 1884, was binding on Clark and Reeder; and that under it there was due from Clark to Reeder $1.70 per acre for the number of acres included within the boundaries of the Dillon survey as run by Sarver, after deducting from the whole number of acres the amount held by persons who held said lands by a better title than that of Reeder by reason of adverse title and possession; that the total number of acres within said exterior boundaries was 54,970, and that the number of acres within the boundaries held by

persons by better title than that of Reeder by reason of adverse title and possession was 7397, leaving as the number of acres to be paid for at $1.70 per acre, 47,572. The decree then fixed the amount due by Clark to Reeder at $70,064, that amount including in addition to the unpaid purchase money for the 47,572 acres of land, charges for taxes, interest, and the $1000 mentioned in the fifth clause of the agreement of February 29, 1884; and decreed that upon payment of said sum of $70,064, with accruing interest, Reeder, his wife joining, should convey the land to Clark in a deed by special warranty, and that on failure by Clark to pay the money the land should be sold by special commissioners named in the decree. And it was further decreed that Clark do not have the relief prayed for in the original bill, and in his supplemental and amended bills, and as to Watts that the bills be dismissed.

The decree further ordered that all actions of ejectment theretofore brought by the receiver be dismissed and the receiver discharged. The case was then brought by appeal to this court.

*Mr. Joseph S. Clark* and *Mr. Richard C. Dale* for appellant.

*Mr. James McColgan* and *Mr. Bernard Carter* for appellee.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The theory of the original bill was that the complainant was entitled to a rescission of the contract of February 29, 1884, on the ground of a mutual mistake of himself and Reeder in regard to the alleged fact that the larger part of the land embraced in the Dillon survey was covered by the Rutter and Etting survey; but any such mistake was denied by the defendant, and was not sustained by the evidence; and by his amendment to his second supplemental bill complainant in effect abandoned the ground of mutual mistake and asked for the rescission of the contract on the ground of fraud only. The charge of fraud is that before and at the time of making and executing the agreement, Reeder and Watts knew of the existence of the Rutter and Etting survey,

of its location with reference to the Dillon survey, of the interlock between the surveys and very nearly the extent of such interlock, and that the Rutter and Etting survey was the older of the two; that they, and each of them, intentionally and with intent to defraud Clark, withheld and concealed from him and from his agent and from his attorney knowledge or information of these matters, and thereby fraudulently induced the agent and attorney to make and execute the agreement on behalf of Clark; that Watts on his own behalf and as the agent of Reeder, with intent to defraud Clark, falsely represented to Clark's agent and attorney at the time of the making of the agreement that there was no older title than the Dillon patent to any part of the land embraced therein, and that the only claims that could or would be set up adversely to Reeder's title would be grants for parts of the lands junior to the Dillon patent; and that the agent and attorney, believing the statements to be true, entered into and executed the contract on behalf of Clark, which they would not have done except for the statements and their belief in their truth; and that the agreement was procured to be made and executed by and through the alleged fraudulent concealments and false representations, but for which the contract would not have been made.

In entering into the contract, Watts assumed to act not only for himself but for Reeder, and we accept the ruling of the Circuit Court that in approving the contract Reeder assented to Watts' agency, and in taking the benefit of the contract would be bound by any conduct on his agent's part which might entitle Clark to a rescission.

In *Farrar* v. *Churchill*, 135 U. S. 609, 615, we said: "The general principles applicable to cases of fraudulent representations are well settled. Fraud is never presumed; and where it is alleged the facts sustaining it must be clearly made out. The representation must be in regard to a material fact, must be false and must be acted upon by the other party in ignorance of its falsity and with a reasonable belief that it was true. It must be the very ground on which the transaction took place, although it is not necessary that it should have been the

sole cause if it were proximate, immediate, and material. If the purchaser investigates for himself and nothing is done to prevent his investigation from being as full as he chooses, he cannot say that he relied on the vendor's representation." And in *Farnsworth* v. *Duffner*, 142 U. S. 43, 47: "This is a suit for the rescission of a contract of purchase, and to recover the moneys paid thereon, on the ground that it was induced by the false and fraudulent representations of the vendors. In respect to such an action it has been laid down by many authorities that, where the means of knowledge respecting the matters falsely represented are equally open to purchaser and vendor, the former is charged with knowledge of all that by the use of such means he could have ascertained. . . . But if the neglect to make reasonable examination would preclude a party from rescinding a contract on the ground of false and fraudulent representations, *a fortiori* is he precluded when it appears that he did make such examination, and relied on the evidences furnished by such examination, and not upon the representations." In the latter case, the syllabus of *Ludington* v. *Renick*, 7 W. Va. 273, was quoted as follows: "A party seeking the rescission of a contract, on the ground of misrepresentations, must establish the same by clear and irrefragable evidence; and if it appears that he has resorted to the proper means of verification, so as to show that he in fact relied upon his own inquiries, or if the means of investigation and verification were at hand, and his attention drawn to them, relief will be denied."

The contract was that Reeder agreed to sell and convey, with covenants of special warranty, a tract of land containing 50,096 acres, more or less, which tract was granted by Virginia to Edward Dillon by patent dated April 16, 1796, and claimed and owned by Reeder by regular chain of title, the first being a tax deed to Ward and Lawson, dated December 22, 1857; the sale to be a sale by the acre and not in gross; that the amount of the purchase money was to be $1.70 per acre; that from the number of acres within the boundaries of the grant as it had been surveyed by Sarver, with which survey Clark was satisfied, should be deducted such number of

acres as should be ascertained by actual survey to be held by persons by better title than that of Reeder, by reason of adverse title and possession; and it was further provided that the contract of sale should be void unless James H. Ferguson should within thirty days from the date of the agreement "certify the title of said Reeder to said land to be good and valid," and if within the thirty days Ferguson should certify that the title was good and valid, then $35,000 of the purchase money was to be paid and the remainder as soon thereafter as the surveys needed to ascertain what lands within the boundaries were held by a better title than that of Reeder, by reason of adverse title and possession, were made. The question submitted to Ferguson and to be determined by him was whether Reeder had a good and valid title to all of the land which by the patent had been granted to Dillon, except those parts which should afterwards be found to be in the actual possession of persons who denied Reeder's title, so that Ferguson was to examine into the validity of the title and his certificate was to be conclusive as to that. The amendment setting up the fraud relied on to set aside the contract did not allege that the certificate as to the title was given because of the reliance on the silence of Watts and Reeder as to the interlock between the two surveys, or reliance on any affirmative representations of Watts, and if Ferguson before giving the certificate was aware of the fact of the interlock, what he believed when the contract was made would furnish in itself no sufficient ground for rescission. The certificate stated that Ferguson had made a full examination of the matter pertaining to the title to this tract of land, and that "The only title which can be found older than the Dillon patent is a grant from the Commonwealth of Virginia to Rutter and Etting, dated the 9th day of January, 1796. There is from the best information I can obtain a small portion of the Rutter and Etting survey embraced within the Dillon survey, but the Rutter and Etting survey was forfeited long prior to 1837 to the State of Virginia for the non-payment of taxes thereon and for the non-entry thereon in the land books of the proper county, and was sold by the commis-

sioner of delinquent and forfeited lands some forty or more years ago. At the time of that sale, the taxes on the Dillon survey had always been paid, and for that reason the title to the whole thereof became good and valid, so far as the Rutter and Etting survey is concerned." And the certificate concluded with these words : " I therefore do certify that in my opinion the title of Charles Reeder to the said Dillon survey is good and valid, except as to such parts of said tract of land as may be affected by the claims of the occupants aforesaid, which may or may not be superior to the title of said Reeder." It thus appears that Ferguson had ascertained that at least a part of the land was included in the older grant, and that he nevertheless certified that the title to the land covered by the Dillon survey was good and valid because he knew and declared that the Rutter and Etting grant had been forfeited long prior to 1837, and determined that because of the forfeiture and the fact that the taxes on the Dillon land had always been paid, the title had become vested in the holder of the Dillon grant. It is true that Ferguson testified that he obtained the information that a portion of the land covered by the Dillon grant was included within the Rutter and Etting grant from Watts between the time of the execution of the agreement and the giving of his certificate, and that Watts represented the interference as but small; yet it would seem that if Ferguson considered the question of the existence of the interference material he would have examined into its extent, and his certificate shows that he considered the Rutter and Etting grant altogether null and void, and that by its forfeiture the Dillon title had become perfected, so that, knowing as he did that there was an interlock, it cannot be assumed that Ferguson was affected by the failure of Watts and Reeder to tell him of its existence or by the assertion of Watts that no older title interfered with the Dillon grant. Moreover, it does not appear that Watts had any particular information as to the extent of the interference which was not open to every one, and probably reliable information upon the subject depended upon the surveys of the two tracts.

The record shows that Mr. Ferguson had had a large ex-

perience in the examination of. land titles in West Virginia, their forfeiture and validity, the overlapping of different grants for the same land, and the construction of the laws of Virginia and West Virginia in regard to land titles; and that he had practised many years in the counties where the land was situated. He testified that when he first commenced to practise in that locality these surveys were in the counties of Fayette and Logan as he now understood their boundaries, and that, in the course of his practise in Logan County, he became acquainted with the existence of both of the surveys and with the fact that the Rutter and Etting survey had been sold as forfeited and delinquent by General Albert Beckley, commissioner of delinquent and forfeited lands for Fayette County. That sale took place in 1840, and the report of General Beckley, made to the Circuit Court of Fayette County, stated that the Rutter and Etting grant had been carefully resurveyed, and that the survey showed that within the boundaries of said Rutter and Etting grant nearly the whole of the 50,096 acres patented to Edward Dillon was included. The matter of such a claim was of record then as early as 1840, and the certificate refers to the sale, so that no matter what was the opinion about it expressed by Watts, if the question of the extent of the interlock was material, a survey might well have been had before the certificate was given.

The record further discloses that copies of both the Dillon and the Rutter and Etting grants were sent to Watts by Reeder and delivered to. Clark's agent for Ferguson, and Clark says in his second amended and supplemental bill that he is informed by his said counsel that when the fact that the Rutter and Etting survey covered a portion of the Dillon survey came to his knowledge after the execution and approval of the contract and after examination and investigation, he, as far as was then possible, looked into the matter and was satisfied that if there was any interference between the two surveys it was so small and unimportant as not to seriously impair the value of the Dillon survey even if it should prove the better title, and in this belief he gave his certificate; a statement

quite different from asserting that he acted on the statements of Watts as to the extent of the interference.

Apart from all this, we cannot consistently hold that the evidence sustains the amendment to the second supplemental bill to the effect that Reeder and Watts knew of the extent of the interference of the Rutter and Etting grant, and that it included the larger part of the Dillon grant, and wilfully and fraudulently withheld the information, because they believed that if known to Clark or his agent or attorney it would prevent the sale of the land, or that Watts affirmatively represented that there had never been any older grant which affected the Dillon grant.

We entirely concur with the statement of Mr. Justice Harlan in his opinion on the circuit, that : " I am satisfied that no one connected with this business knew the full extent of this interlock." It is not pretended that Reeder made any representation to Clark or his agent or attorney, and his testimony shows that in the course of the survey of 1873 by Sarver, the survey which by the agreement was declared to be taken as ascertaining satisfactorily the boundaries of the land, Sarver discovered that there was some interference between the two surveys, and pointed out the place where the south line of the Rutter and Etting survey crossed the western line of the Dillon survey ; and Reeder testified that " exactly how much land was embraced in the interlock was not known, and I did not consider it important to know, as I was advised, by my counsel, and had other good authority for believing, that the Dillon title would unquestionably hold as against the Rutter and Etting, and consequently as against titles derived from the Rutter and Etting." And he said in his answer to the interrogatories of the second supplementary bill: " I did not then nor do I now know to what extent the Rutter and Etting survey laps on the Dillon, nor do I think that any one else knows, because from the facts which have come to my knowledge I do not think that any more than the first line of the Rutter and Etting survey was ever run by the surveyor originally." There appears in the record a letter from Watts to Reeder under date of November 8, 1873, in reply to one from Reeder

enclosing him a sketch from the Sarver survey, which sketch showed that the larger part of the Dillon tract was included in the Rutter and Etting grant, (also called the Duval, Duval having made the original entry,) in which Watts not only gave his own reasons for believing that the sketch did not truly represent the relations of the two tracts, and that in his judgment it would be impossible for the Duval to lap on the Dillon survey, but advised Mr. Reeder that he had showed Judge Ward the sketch and plats Reeder had sent, and Judge Ward told him the Dillon survey was perfect, the best in West Virginia; and that the Duval had never been run; and Watts added that he was satisfied that this was true, and that the Duval was only gotten up for a speculation. We think it does not admit of reasonable doubt that Mr. Reeder believed that there was nothing in the Rutter and Etting grant which impaired his title to the Dillon grant, although, nevertheless, he sent, with all his title-papers, the copies of the surveys of both tracts to Watts at the time a sale of the land was contemplated "for examination, and in order that it should be a full and thorough examination."

And notwithstanding a serious conflict of evidence, we are not persuaded that the specific statements of Watts in his answers, and his testimony, as to his knowledge of the extent of the interlock, and as to what he communicated to Ferguson and Bell, in denial of any fraudulent concealment or fraudulent representation, can properly be treated as overcome, the documentary and undisputed evidence being considered, and due regard being had to the infirmities of human memory. It was known at the time the certificate was given that the Rutter and Etting patent was older than the Dillon patent, and that there was an interlock, but the parties had agreed to take the exterior boundaries of the Dillon survey as made by Sarver, and Clark was given the right by a survey at his own expense to ascertain what lands within those boundaries were held by a better title than Reeder's, by reason of adverse title and possession. And if the Rutter and Etting survey had been forfeited long prior to 1837, and the title to the Dillon survey had become good and valid so far as the Rutter and

Etting survey was concerned, or this was believed to be so by all parties, it is not extraordinary when afterwards the extent of the interlock was raised as an objection to complying with the contract, that there might be a want of precision of recollection as to exactly what did pass in reference to that particular matter. It is remarkable that nowhere in the pleadings or in the testimony is it alleged or suggested that the Rutter and Etting title is good and valid as against Reeder under the Dillon title. The result of the report of the special master was that the only portion of the whole of the Dillon survey now in the possession of persons claiming title adverse to Reeder was 7397.75 acres, out of a total of 54,907.5 acres, and 7379.75 was by the final decree adjudged to be the number of acres actually held by better title than that of Reeder by reason of adverse title and possession, and for this Clark was not required to pay; and in relation to this matter we cannot do better than to quote from the opinion of the Circuit Court, as follows: "The utmost shown is that most of the Dillon survey is within the lines of the Rutter and Etting survey; but, as already said, this might be true, and yet Reeder's right be the better in law. Can it be a sufficient ground to set aside the contract for the plaintiff to show that a large part of the lands in question are within the lines of a patent older than the one under which Reeder claims and that they are claimed adversely to Reeder, especially when Reeder only agreed to convey with special warranty, and when the plaintiff agreed to pay for all the lands covered by the Sarver survey, except such as were shown by a survey, had at his expense, to be held 'by adverse title and possession,' constituting a better title than Reeder's? I think not."

We are of opinion that the Circuit Court was right in concluding that complainant was not entitled to a rescission of the contract.

By the interlocutory decree the court directed the ascertainment of the number of acres of land within the exterior boundaries of the Dillon grant as run by Sarver to which there was shown to be a better title than Reeder's, "by reason of adverse title and possession," and this included any who were

in adverse possession claiming title under the Rutter-Etting patent, and who by reason of such adverse title and possession had a better title than Reeder; and, this having been done, the final decree on the cross-bill adjudged and decreed the amount to be paid to Reeder by Clark, and on failure of Clark so to do, the sale of the land. We see no reason to question the correctness of that course. The Circuit Court held, and we have arrived at the same conclusion, that Clark was not entitled to rescind the contract on the ground of fraud; and this involved holding that Clark was bound by the contract according to its terms, and consequently to pay for the number of acres embraced within the exterior bounds of the Dillon grant, as surveyed by Sarver, less the number of acres within those boundaries held by a better title than that of Reeder by reason of adverse title and possession. This being so, and the number of acres having been ascertained in accordance with that contract, Reeder was entitled to a decree for a sale of the land for the sum due him as the balance of the purchase money.

A court of equity may sometimes refuse to decree specific performance in favor of one party when it would also refuse to rescind in favor of the other. But this is not a case to which that principle is applicable. Nor is it a case in which a vendor asks the court to compel a purchaser to accept a doubtful title. It is a case where the decree gives to the purchaser what he purchased, in accordance with the terms of his contract, and the vendor is entitled to have the property devoted to the payment of the purchase price if the purchaser declines to pay.

*Decree affirmed.*

MR. JUSTICE GRAY was not present at the argument and took no part in the decision of this case.