[Civil No. 1950. Filed March 11, 1922.]

[204 Pac. 1013.]

# ROY SORRELLS, Appellant, v. J. Q. CLIFFORD, Appellee.

1. FRAUD—ESTIMATE OF NUMBER OF CATTLE HELD NOT ACTIONABLE.— In an action for damages for misrepresentation in a cattle trade, wherein all the cattle in two brands were exchanged, consisting of statements by defendant that there were 1,000 head or more in his brand, *held*, that such representation was merely a guess or estimate, and must have been so regarded by plaintiff, and hence could not constitute actionable misrepresentation.

2. FRAUD—REPRESENTATIONS TO PARTY INVESTIGATING NOT ACTIONABLE. In an action based upon misrepresentations by defendant in an exchange of all the cattle in defendant's brand for the cattle in plaintiff's brand, if representations by defendant that there were 1,000 head or more in his brand, were of fact, and not of opinion, no recovery could be based thereon where plaintiff had investigated the representations before the trade was consummated.

3. FRAUD—REPRESENTATIONS TO PARTY KNOWING FACTS NOT ACTIONABLE.—In an action for damages for misrepresentations as to the quality of cattle traded, the statement being that they were as good as the cattle in another named brand, no recovery could be had where plaintiff, an experienced cattleman, knew whether the cattle were as good as represented or not.

APPEAL from a judgment of the Superior Court of the County of Pima. S. L. Pattee, Judge. Reversed.

Mr. S. M. Franklin and Mr. Gerald Jones, for Appellant.

Messrs. Kingan, Campbell & Conner, and Mr. S. F. Noon, for Appellee.

ROSS, C. J.—The material facts giving rise to this litigation are as follows: Plaintiff, Clifford, was the owner of the 44 brand of cattle and horses, ranging partly in Mexico and partly in Santa Cruz county, Arizona, and the defendant, Sorrells, owned the OXO brand of cattle, ranging in Santa Cruz county. On September 19, 1919, at Nogales, in pursuance to an agreement made September 12th, they traded brands by each executing to the other a bill of sale of his brand, making no mention therein of the number or kind of cattle in either brand. The deliveries were constructive or range deliveries, and were effected by the exchange of bills of sale.

March 5, 1920, plaintiff filed his complaint against defendant, charging the latter with fraudulently representing the number of cattle in the OXO brand as 900 of the age of one year and upward, whereas there were, as defendant well knew, not more than 700 head.

Thereafter plaintiff amended his complaint, charging that defendant misrepresented the facts in two respects, as follows: (1) That there were at least 1,000 head of cattle in the OXO brand of the age of one year and upward; and (2) that they were of a quality and grade equal to certain cattle bearing the 7X brand; that plaintiff relied upon such representations; that they were false, and known to defendant to be false, as in truth there were not more than 700 of the OXO cattle of the age of one year and upward, and they were greatly inferior in quality and grade to the cattle bearing the 7X brand.

23 Ariz.—29

The defendant in his answer denied all the material allegations of the complaint. The verdict of the jury was in favor of the plaintiff for $4,110, upon which judgment was entered. The appeal is from the order refusing new trial and from the judgment.

The defendant complains of the court's refusal at the close of the case to instruct the jury on his motion to return a verdict for defendant, and also for like refusal at the close of the whole case. The motions were predicated upon the proposition of law:

"That, where the purchaser investigates for himself, and nothing is done to prevent his investigation from being as full as he chooses, he cannot say that he relied on the vendor's representations, and his reliance on such representations, however false they may have been, affords no ground of complaint."

Plaintiff does not deny he made an investigation. Negotiations for the trade extended over a period of more than thirty days—from about the middle of August to September 19th. During this time plaintiff, who was an experienced cattleman, employed three sources to inform himself of the number, quality, and grade of the OXO brand of cattle: (1) He rode the OXO range on two different occasions; (2) he made inquiries of the cowboys in charge of the OXO cattle, who were familiar with them and the probable number of cattle in the brand; and (3) he made inquiries as to the number of calves branded as shown by the calf tally-books. He was told by the cowboys that there were 1,000 or more cattle in the OXO brand. The tally-books were exhibited to plaintiff for each of the three years previous, and the number of calves branded were figured up in his presence. The tally-books showed there had been branded 277 the third year before. After informing himself through the three sources above, plaintiff said:

"I figured that they had had 1,000 head all the time for the last three years in that brand."

Supplementing the information obtained by his personal investigation pending the trade was plaintiff's general knowledge of the OXO range and cattle, from their occupying the same or adjacent range to that of the 7X brand. Some of the cattle in the 44 brand that plaintiff traded to defendant ranged in the territory adjoining the range of the 7X and OXO cattle, and plaintiff stated he knew the 7X brand very well; that he was more familiar with it than with the OXO brand. He said:

"I know the 7X cattle and lots of the OXO's run in the 7X country. I had ridden among the 7X cattle before that. I had an option or interest in the 7X before I made the exchange."

The proposition originally was not to trade brands. It was that defendant gather and deliver to plaintiff a certain number of OXO cattle in exchange for the 44 brand of cattle and horses. To that end defendant offered (this on September 12) to gather and deliver 900 head of the OXO's, counting the calves for the 44 brand. The plaintiff's counter proposition was to trade his brand for 900 head of the OXO brand, yearlings up, and calves thrown in. Each drew up a bill of sale to the other incorporating the above offers, but, as neither was satisfied with the other's proposition these instruments were destroyed, and they parted, each going his way. Later in the same day, however, they came together again and renewed their negotiations. Defendant, according to plaintiff's testimony, at this time offered to gather and deliver 900 head of the OXO cattle, yearlings up, for the 44 brand.

"I said, 'I will trade brands with you.' . . . I told him then and there I would trade brands with him and he said all right, we would trade."

It is unquestioned that defendant at all times, when talking to plaintiff, represented that there were 1,000 or more cattle in the OXO brand, and that that was the estimate of all others to whom plaintiff appealed in his investigations. Several cattlemen, familiar with the OXO brand and their range, were witnesses, either for the plaintiff or defendant, but there was no effort to show by them that the estimate of defendant, and others inquired of in the circumstances, was other than reasonable, much less recklessly extravagant. It is unquestioned that defendant offered to guarantee there were 900 head in the OXO brand when he told plaintiff he would gather and deliver that number for the horses and cattle in the 44 brand. The plaintiff says the reason he did not take the guarantee of the 900 head was:

"I told him [defendant]—by that time I had decided that there was 1,000 head of these cattle and I thought if he gathered the 900 head that he would keep out the good ones, you know, between the 900, whatever was over the 900. So I told him I would trade the brand."

It was in evidence that it was the custom of cattlemen to estimate the number of cattle in any given brand at large on the range by multiplying the number of calves branded in any given year by the figure 4. The plaintiff said:

"The calf crop is one way of estimating it [number of cattle]. It is the principal way."

He further said, basing his opinion upon the number of calves the tally-book showed had been branded, he thought there were about 1,000 head of the OXO cattle. July 20, 1920, plaintiff sold the OXO brand of cattle, and at that time there had been gathered 822 head of all ages. The estimates of those left on the range ungathered differed from 300 to a very few.

In view of all the facts as thus disclosed, the question is, Did the court err in submitting the case to the jury, and in not sustaining the defendant's motion to instruct the jury to return a verdict in his favor? In 12 R. C. L., page 244, section 14, it is said:

"As a general rule, in order to constitute actionable fraud the false representation must relate to a matter of fact, and such fact must be one which exists in the present or which has existed in the past. It must also relate to a fact which is susceptible of knowledge; otherwise there is nothing in relation to which the person making it could state what he knew to be untrue. Generally, therefore, fraud cannot be predicated upon the mere expression of an opinion which is understood to be only such or cannot reasonably be understood to be anything else, nor upon representations in regard to matters of estimate or judgment. The person to whom such statements are made has no right to rely upon them, and does so at his peril, nor can it be supposed that they influenced his judgment."

Smith on the Law of Fraud, section 1, says:

"No specific rule can be laid down as to what are fraudulent representations. It depends upon the particular facts, the relative situation of the parties, and their means of information. If the representation is false, and the party accepts it with his eyes open, he cannot complain. If the parties have equal means of information, the law of *caveat emptor* applies, and no recovery can be had. Where the representation is a mere commendation or matter of opinion, and the parties are on equal footing, the courts will not interfere."

In *Vulcan Metals Co.* v. *Simmons Mfg. Co.*, 248 Fed. 853, 161 C. C. A. 7, it is said:

"When the parties are so situated that the buyer may reasonably rely upon the expression of the seller's opinion, it is no excuse to give a false one. *Bigler* v. *Flickinger*, 55 Pa. 279. And so it makes

much difference whether the parties stand 'on an equality.' For example, we should treat very differently the expressed opinion of a chemist to a layman about the properties of a composition from the same opinion between chemist and chemist, when the buyer had full opportunity to examine. The reason of the rule lies, we think, in this: There are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity. If we were all scrupulously honest, it would not be so; but, as it is, neither party usually believes what the seller says about his own opinions, and each knows it.''

As was said of a like contention to the one here, also involving a cattle trade, in *Cole* v. *Smith,* 26 Colo. 506, 58 Pac. 1086:

''They [plaintiffs] could not shut their eyes to the facts which they knew, or by proper inquiry could have ascertained, that they were buying a herd of cattle ranging on the public domain, the number of which was unknown both to them and to the defendant, and that, necessarily, they ran more or less risk in making the exchange which they did.''

The case of *Stewart* v. *Wyoming Ranche Co.,* 128 U. S. 383, 32 L. Ed. 439, 9 Sup. Ct. Rep. 101, was an action for damages for deceit against the seller for representing to the buyer that the calves branded for the year 1882 at the date of sale were 2,800, and that the herd consisted of 15,000 head exclusive of that year's increase, which representations were false. The buyer was permitted to recover, because, when he sought through his agent to inquire from the foreman of the ranch and other persons as to the number of calves that had been branded, he was induced by the seller to desist, and requested to rely on the seller's representations as to the number of calves branded. In that case, however, the following instruction, given at the trial, was approved by the Supreme Court:

''And no expression of opinion or judgment or estimation, not involving the assertion of an unconditional fact, can constitute actionable false representation.''

Here plaintiff and defendant were both experienced cattlemen, and in that respect their case is analogous to one chemist selling a composition to another chemist or one jeweler selling a diamond to another jeweler after investigation. Neither could be said to have any advantage over the other in knowledge or experience in judging, handling, and trading in cattle. Of course, if defendant stated that he had 1,000 or more head of cattle in the OXO brand, the plaintiff knew from the very nature of things that it was an estimate. The cattle were at large, grazing over an extensive range, and the only possible way to have determined that there was 1,000 or more was to have rounded them up and counted them. So far as the record is concerned, the plaintiff had every source of information as to the number of cattle in the OXO brand that the defendant had. Those of whom he inquired, cowboys looking after the cattle, presumably were as well acquainted with the number, or perhaps better, as the defendant. There is no suggestion that the tallies submitted to the plaintiff for the three preceding years were padded or inaccurate. Clearly, therefore, when defendant stated that there were 1,000 head or more in the brand it was merely his guess or estimate, and plaintiff must have so regarded it.

''Mere general commendations of property sought to be sold, commonly known as trade talk, dealer's talk, seller's statements, or puffing, do not amount to actionable misrepresentations where the parties deal at arm's-length, and have equal means of information and are equally qualified to judge of the value of the property sold. This rule is based on the universal practice of the seller to recommend the article or thing offered for sale and to employ more or less extravagant language in connection therewith.'' 12 R. C. L., p. 250, § 18.

But if it be assumed that defendant's representation as to the number of cattle in the OXO brand was one of fact, and not of estimation or opinion, we are confronted with the proposition that plaintiff investigated the representation before the trade was consummated. The rule in such circumstances has been announced in this state in two cases. *Mitchell Mining Co.* v. *Hammons,* 12 Ariz. 300, 100 Pac. 795; *Dooley* v. *Burlington etc. Co.,* 12 Ariz. 332, 100 Pac. 797. In the Mitchell case it was said:

"Where the purchaser undertakes to make investigations of his own, and the vendor does nothing to prevent his investigation from being as full as he chooses to make it, the purchaser cannot afterward allege that the vendor made misrepresentations."

In the Dooley case:

"Having investigated for himself, he may not now claim to have relied upon the representations as to the then condition of the mines."

It is true that the rule here announced had reference to representations in connection with the sale of mines involving the charge that the vendor had misrepresented to the vendee the character and quantity of ore "in sight." It is conceivable that the rule is not only just and equitable, but perhaps the only practicable one in such cases. No one can tell whether an ore body will remain uniform in size and richness or whether it will pinch out. Therefore the vendee of a mine, having investigated the mine, cannot, when it fails to measure up to representations, recover damages for deceit. Experienced cattlemen, dealing with cattle upon the range, also know that they are liable to be mistaken in estimating the number.

The rule is stated in 2 Pomeroy's Equity, fourth edition, section 1893, as follows:

"If, after a representation of fact, however positive, the party to whom it was made institutes an in-

quiry for himself, has recourse to the proper means of obtaining information, and actually learns the real facts, he cannot claim to have relied upon the misrepresentation and to have been misled by it. Such claim would simply be untrue. The same result must plainly follow when, after the representation, the party receiving it has given to him a sufficient opportunity of examining into the real facts, when his attention is directed to the sources of information, and he commences, or purports or professes to commence, an investigation. The plainest motives of expediency and of justice require that he should be charged with all the knowledge which he might have obtained had he pursued the inquiry to the end with diligence and completeness. He cannot claim that he did not learn the truth, and that he was misled.''

The learned author gives the reason for the rule as:

'' . . . The practical impossibility in any judicial proceeding of ascertaining exactly how much knowledge the party obtained by his inquiry; and the opportunity which a contrary rule would give to a party of repudiating an agreement or other transaction fairly entered into, with which he had become dissatisfied.''

The rule laid down by Pomeroy, *supra,* seems to have met the approval of this court in *Mitchell Mining Co.* v. *Hammons, supra,* as it is quoted therein. It is quoted with approval in *Hackleman* v. *Lyman* (Cal. App.), 195 Pac. 263.

Up to this point our attention has been given to that feature of the complaint charging the defendant with misrepresenting the number of cattle in the OXO brand. We now turn to the charge in the complaint that the defendant misrepresented the quality or grade of the cattle. Defendant admits that in the negotiations leading up to the trade he told plaintiff the OXO cattle were as good as the cattle in the 7X brand. Upon the trial the defendant insisted that the OXO were as good as the 7X. There was evidence introduced in behalf of the plaintiff to the effect

that the 7X cattle were worth $10 per head more than OXO cattle. The evidence also showed that intermingled with both these brands were about five or ten per cent Mexican cattle; that for several years both herds had been served with white-faced Hereford bulls.

As we have heretofore seen, plaintiff had more or less familiarity with the OXO cattle before the negotiations for their purchase by him was started. He rode the range two days thereafter before the trade was consummated, and admits that he saw some of the OXO cattle; and it is not shown that those he saw were not fair samples of the grade of cattle in the OXO brand, or that he was misled as to the average quality of the brand by those he saw. Plaintiff therefore had a chance to compare the OXO cattle with the 7X cattle as to grade and quality, and, as a cattleman, experienced in the business of cattle raising, he knew at the time the trade was effected whether the OXO's were as good as the 7X's or not. In that regard he exercised his own judgment. This is not a case in which the seller misrepresented the age, health, or condition of the cattle. If it were, under the law he would be liable for any damages sustained by the · plaintiff by reason thereof. *Hitchcock* v. *Gothenburg Water Power Co.,* 4 Neb. (Unof.) 620, 95 N. W. 638. To sustain this feature of the complaint evidence of difference of value in the OXO and 7X brands was introduced, and not to show that the 7X was the higher or better breed of cattle. In other words, the evidence of inferiority in quality or grade of the OXO consisted of showing that they were worth less money than the 7X cattle. We find the law, as stated in 26 C. J. 1215, section 110, to be:

"Misrepresentations as to the value cannot ordinarily constitute fraud because they are generally to be regarded as mere expressions of opinion or 'trader's

talk' involving a matter of judgment and estimation as to which men may differ. It has been held that such representations may, under certain circumstances, be nonactionable even when made with intent to deceive, and with knowledge of their falsity, and *a fortiori* they are not actionable where made in honest ignorance. Where the parties deal at arm's-length with equal means of knowledge, it is obvious that there can be no redress for misrepresentations as to value, because in such a case the hearer should investigate and judge for himself. He has no right to rely upon the speaker's representations as to value, and if he does so and suffers injury it is his own folly, for which the law will grant no relief, and this is especially true where the relation of the parties is antagonistic, or where the hearer has made an investigation before acting, or knows that the speaker is relying upon information from another, or the matter is one of public record.''

While the plaintiff concedes the correctness of the rule as laid down by the predecessor of this court, and as stated in Pomeroy, he contends that the facts in this case do not bring it within that rule, because he says the defendant had known the OXO brand of cattle for twenty years, and was thoroughly familiar with them; they were scattered over very large country, and it was not practicable for plaintiff to ride out and examine the OXO cattle in detail, and he had seen only a very few of them. Granting that this is all true, for the sake of the argument, there still remains the fact that plaintiff, as an experienced cattle man, familiar with the methods of ascertaining approximately the number of cattle ranging on the range at large in any given brand, pursued these methods, and, from all that can be known, relied upon the results of his investigation rather than upon the representations of the defendant. Plaintiff also says:

''While the law is as stated in the cases cited by appellant, it is equally the law that, if the buyer, instead of investigating as fully as he might, made only

a partial investigation, and relied in part on the representations of the adverse party, and was deceived by such representation to his injury, he is not precluded from maintaining action for such deceit.''

—and cites in support thereof *Meland* v. *Youngberg,* 124 Minn. 446, Ann. Cas. 1915B, 775, 145 N. W. 167. That case states the rule as contended for by plaintiff as the rule in Minnesota. It also says:

''But, if the buyer undertakes to investigate and determine the entire matter for himself, and is afforded a full and fair opportunity therefor, and in fact does make such investigation, and is permitted to make it as full and complete as he chooses, and he accepts the property after such investigation, the authorities are practically unanimous that he cannot be heard thereafter to assert that he relied upon the representations of the adverse party.''

To the same effect, *Farrar* v. *Churchill,* 135 U. S. 609–621, 34 L. Ed. 250, 10 Sup. Ct. Rep. 771 (see, also, Rose's U. S. Notes); *Southern Development Co.* v. *Silva,* 125 U. S. 247, 31 L. Ed. 678, 8 Sup. Ct. Rep. 881; *Clark* v. *Reeder,* 158 U. S. 505, 39 L. Ed. 1070, 15 Sup. Ct. Rep. 849; *Farnsworth* v. *Duffner,* 142 U. S. 43, 35 L. Ed. 931, 12 Sup. Ct. Rep. 164; *Pittsburgh L. & T. Co.* v. *Northern C. L. Ins. Co.* (C. C.), 140 Fed. 888–893; *Grinrod* v. *Anglo-American Bond Co.,* 34 Mont. 169, 85 Pac. 891; *Power* v. *Turner,* 37 Mont. 521, 97 Pac. 956. We think, under the law as settled in this jurisdiction, the defendant's motion for an instructed verdict should have been granted.

The judgment is accordingly reversed and the cause remanded, with the directions that the complaint be dismissed.

McALISTER and FLANIGAN, JJ., concur.