## ALGER v. KEITH et al.

(Circuit Court of Appeals, Sixth Circuit. November 7, 1900.)

### No. 760.

1. VENDOR AND PURCHASER—RIGHTS OF PURCHASER—RESCISSION FOR FRAUD.

Where a purchaser, before buying property, causes it to be examined for himself, in order to verify the representations made by the vendor, and nothing is done by the vendor to prevent a full and thorough investigation, the purchaser cannot claim that the subsequent purchase was induced by the fraudulent representations of the vendor; but if his examination is rendered illusory and misleading by the bribery of his agent to whom it is intrusted, or by other fraud or artifice of the vendor, the contract is thereby vitiated, and may be rescinded by the purchaser, who has suffered damage thereby.

2. SAME—LIABILITY OF VENDOR—FRAUDS OF AGENT.

An option contract or title bond was executed by an owner of property to his agents, who were at the time negotiating a sale of such property in his behalf under an agreement that they should have all above a certain price received. Such contract was not recorded, nor its existence made known to the prospective purchaser, with whom the agents continued and

concluded negotiations for the sale, ostensibly as agents for the same owner, throughout; and in the conclusion of the sale he executed the deed to the purchaser and received the consideration. The real purpose of the bond was merely to secure the agents in the control of the property and in their share' of the proceeds, as previously agreed on. *Held*, that such transaction did not terminate the agency, nor relieve the real vendor from responsibility for the fraud of the agents by which the sale was induced.

3. SAME—RIGHT OF PURCHASER TO RESCISSION—LACHES.

Complainant purchased a large tract of land from defendant, through his agents, chiefly for its supposed value as coal land; the agents having represented it as containing veins of coal of a specified thickness. Before purchasing, complainant sent two representatives to verify such representations, the first of whom was bribed by the agents of defendant; and through his collusion the second, who was sent principally to determine the feasibility of working the mines and getting the product to market, was prevented from examining as to the thickness of the veins. On the favorable reports of such representatives, complainant made the purchase. Soon after, in preparing to develop the mines, he discovered that the representations made by defendant's agents were false, and that the land did not contain veins of coal at the opening sufficient to render it of any value; but it was nearly five years thereafter before he discovered the bribery of his first representative, or the fraud and artifice by which the other had been misled, and in the meantime he had made two deferred payments on the property. *Held* that, as his option to rescind the contract of purchase did not arise until he had knowledge of the fraud which rendered his inspection worthless, he was not debarred by laches from equitable relief in a suit promptly commenced after such discovery, and his payment of the purchase money previously could not be considered an election to retain the property; it not appearing that he had been guilty of negligence in failing to sooner learn of the bribery of his agent.

4. PRINCIPAL AND AGENT—NOTICE TO AGENT.

Notice of facts to an agent is constructive notice to his principal only when it comes to the agent while concerned for his principal, and in the course of the very transaction, or so near before it that the agent must be presumed to recollect it.

5. SAME—CONTRACT CREATING AGENCY—OPTION TO PURCHASE LAND.

The execution by the owner of land of an option contract thereon, or title bond, does not per se constitute the holder his agent, and he will not be bound by fraud or misrepresentations inducing a sale to a second purchaser, where such contract is only what it purports to be on its face, and not intended merely as a form of agency; and the rule is the same although it is expected that the contract may be assigned before its expiration, in case the holder of the option should sell the property.

Appeal from the Circuit Court of the United States for the Middle District of Tennessee.

This is a bill filed by Russell A. Alger to procure a rescission of the sale of a large tract of wild mountain land in Franklin county, Tenn. The defendants are Mrs. Louie H. Keith, executrix of the last will of John F. Anderson, the vendee in the conveyance to Alger; John W. Gonce, who had been the owner of the three-fourths interest in one of the tracts included in the conveyance by Anderson to Alger; and several others, who are sued as heirs and representatives of the heirs of John F. Anderson, as a class. The pleadings, in substance, aver that the said lands were purchased by complainant through O. J. Sheridan and W. J. Green, real-estate agents at Chattanooga, Tenn., doing business under the name of Sheridan, Green & Co., and that said Sheridan, Green & Co. were the agents of said John F. Anderson and of John W. Gonce in the sale of said lands to complainant; that said agents made many grossly false and fraudulent representations concerning the timber and coal upon said lands, and as to the title of the vendor to large and material parts of same; that complainant, who lived in a distant state, and never saw said property before the sale had been consummated, undertook to verify the truth of the represen-

tations so made, and for this purpose sent one or more persons to examine and report upon said property, but that the said Sheridan, Green & Co., by tricks, frauds, deceits, and artifices, had prevented such an examination as was intended and desired, and corruptly and fraudulently bribed one A. J. Freer, who was sent by complainant to measure the thickness of veins of coal at the entries or openings upon the property, and to inspect and estimate the timber upon the surface; that the property was bought upon the faith of the representations so made by the agents of the vendors, and upon the reports of those representing complainant, who had either been deceived and misled by the active fraud of the agents of the vendors, or corruptly bribed to hide the truth and induce the sale by false reports. It is then averred that the fraudulent and corrupt conduct of said Sheridan, Green & Co. in respect to the agents upon whom complainant relied was not discovered until April, 1894; the bill being filed in August of the same year. The answer denied all fraud, denied that Sheridan, Green & Co. were acting as agents for either the said John F. Anderson or John W. Gonce in making said sale, and denied that complainant had but recently discovered the alleged frauds practiced upon him by said Sheridan, Green & Co. A vast amount of evidence was taken, and the cause brought to a hearing before Clark, District Judge, who, in a full and careful opinion, found that the averments of the bill were fully sustained, and granted a decree for rescission, as prayed. Subsequently and at the same term a rehearing was allowed, and the case opened for proof upon alleged newly-discovered evidence tending to show that complainant had knowledge of the several frauds which he claimed had been practiced upon him several years before seeking rescission, and long antecedent to the date of his alleged discovery of the bribery of his agents. Much additional evidence was submitted upon this aspect of the case, and upon a final hearing the former decree was set aside and the bill dismissed upon the ground that complainant, after knowledge, had elected to abide by the transaction, or had been guilty of such delay in seeking rescission as to repel him from a court of equity, and remit him to his remedies at law upon the covenants of his deed, and his action for fraud and deceit. From this decree the complainant has appealed. Further facts will appear in the opinion.

Albert D. Marks, Floyd Estill, and J. J. Lynch, for appellant.
Frank Spurlock and John J. Vertrees, for appellees.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

It will not be possible or profitable to go over in detail the complicated facts presented by the transcript of the record before us, and we shall chiefly advert to such of the more prominent matters which involve the substantial merits of the case, stating for the most part only those conclusions of fact which we reach from an attentive examination of the whole of the evidence. The case resolves itself into these several questions: First, did Gen. Alger make the purchase of the lands in question, induced by false and material misrepresentations made as to the character and extent of the timber and coal on the lands, and as to the title of the vendor to the lands included within the boundaries of his deed? Second, were the efforts of complainant to verify these representations before concluding the purchase frustrated by the artifices of the vendor or his agents, so that the fraudulent character of the representations was concealed, and false reports by complainant's agents thereby induced? Third, were Sheridan and his associates in the sale the agents of the vendor? Finally, does the evidence show that after knowledge of the fraud

the complainant exercised his option to take the property notwithstanding the fraud, or have the lapse of time and other circumstances interposed any bar to the maintenance of a bill for rescission? A collateral question will be the liability of the defendant John W. Gonce to account for that part of the purchase money received by him, as the owner of an interest in one of the parcels included in the deed of John F. Anderson.

1. In respect of the first question it may be said that before the conclusion of the sale the complainant discovered that the timber was not nearly so abundant or valuable as had been represented, and we are not satisfied that he was induced to make the purchase by reason of any representations in this regard. In regard to the representations touching the title of the vendor to the lands sold, it is perhaps established that there is a shortage in acreage, the sale having been by the acre; but this shortage is not of so material a character, nor the fraudulent character of the representations in that respect so well made out, as to justify a decree of rescission wholly on that account. The remedy upon the covenant of seisin and warranty will abundantly protect complainant, if pursued, against any consequence of such shortage. We may as well say here that the court below seems to have based its action wholly upon the question of fraud in respect to the representations as to the coal upon the lands, and the learned counsel upon both sides have expended their strength mainly upon the consequences to be deduced from the representations and frauds affecting the values of the land for coal-mining purposes. The case for rescission must turn here. There can be no reasonable ground to doubt but that this land was purchased mainly, if not altogether, upon the representations touching the existence of workable veins of coal, which were represented to show, in entries made by the vendor, or natural exposures, a thickness of from 4 to 11 feet. These representations were made in printed circulars and letters issued by Sheridan, Green & Co., who represented themselves as real-estate agents having the land for sale, and who addressed themselves to Gen. Alger, then and now residing at Detroit, Mich. Gen. Alger was a man of large means, and had been engaged in many important business enterprises, chiefly connected with the lumber interests of his state. The time was propitious for attracting his attention. The mountain region of Tennessee and North Alabama was known to be rich in minerals and timber, and a curious spirit of wild speculation in such lands was then prevailing, which led to much ultimate disaster to many of those who came under its influence. O. J. Sheridan and his partner had been residents of Michigan, and acquainted with complainant's speculative tendencies. Hence they addressed him, as a possible purchaser. He replied, making inquiries as to price, terms, etc. At this stage of the case another Michigan man, to some extent an acquaintance of the complainant, was utilized for the purpose of inducing a sale to him. This was one E. J. Lynn. Sheridan and Green, concluding that Lynn's acquaintance might be of value, secretly interested him in the commissions or profits to be made in case of a sale. Lynn's connection with them was not at once disclosed. He was

for a time held out as himself a probable purchaser, and an oral option given him. Lynn "dropped in" on Gen. Alger, accidentally, according to the color given the interview, and told the general of this body of land, and fixed his attention upon it. Finally the complainant determined to investigate the matter, being attracted at first by the vast quantities of valuable timber represented as standing upon it. He sent, for this purpose, one A. J. Freer to go over the land and report as to the representations made touching its timber and coal. Sheridan and his associates were notified that Freer would go down as the agent of complainant, and that complainant would be largely governed by his report. Without going into details, it is enough to say that Freer made glowing reports, both written and oral, to complainant as to the thickness of the coal veins exposed in the old entries and otherwise. He professed to have measured several veins which showed a thickness of solid coal of from 4 to 11 feet, and made a detailed report from entries made at the time and on the ground in a memorandum book. His timber report was, however, not particularly favorable, and the preponderance of evidence indicates that the timber value cut no material figure in inducing the further action of the purchaser. The report as to coal was, however, alluring. Veins of good coal, running from 4 to 11 feet, within a very short distance of a railroad giving a market at Chattanooga and Nashville, offered a great inducement to any one with capital. But complainant was not a coal man. His field had been timber. Still, here was a most attractive investment. In this situation, he induced one O. W. Shipman, a friend, who was a coal operator, to go down and look at the possibilities for a successful coal-mining enterprise. Shipman went. Freer went with him, as did Sheridan, the chief engineer of the deal. The old entries were visited. These were rude and not extensive. They had been made by the vendor, John F. Anderson, for local purposes in part, but chiefly to develop the possibilities of the property. They were the places theretofore examined by Freer, and the thickness of the coal vein had been measured and reported by him. When Shipman made his examination, it was found that water had accumulated in the bottom of the entries. Sheridan expressed great regret at this, as Shipman was unprepared to explore them in this condition. The result was that no examination of any value was made. In one entry a measuring stick was put down in the water until it rested on the bottom, which was represented by one of the laborers present as corresponding with the bottom of the vein exposed above the water. Measurements thus obtained corresponded with Freer's memorandum, and his report thus supposed to be verified. In other instances, Shipman simply looked at the openings and their relation to the railroad, and called upon Freer and Sheridan for information as to the thickness of the vein, as shown by Freer's former investigation. The prime purpose in sending Shipman was not so much to verify Freer's report as to the existence of workable veins of coal, as to report upon the facilities for mining and marketing the product. These openings were upon the side of the mountain, and Shipman was pleased with the accessibility of the coal, the markets,

and the transportation outlook, and so reported. The sale was concluded. The price aggregated $103,728. Of this amount, $51,364, or one-half, was paid in cash. For the remainder notes were made, payable in one, two, and three years from date,—all payable to John F. Anderson, the ostensible vendor. A warranty deed was executed and delivered, the title having been made satisfactory to the counsel representing complainant. The deed was dated March 14, 1889, but executed March 21, 1889. The price was paid and notes executed March 21, 1889. For the purpose of determining how best the property might be developed, Mr. O. S. Shipman in the summer of that year put a small force at work in developing the old entries and certain other exposures. In a short time it was shown that there was not a vein of coal on the property much exceeding 12 inches in thickness, and that the property was worthless for mining purposes.

2. How did this imposition come about? The proof makes it most evident that A. J. Freer at some stage of the negotiations was bribed by those engaged in making the sale. Just at what stage does not clearly appear, but certainly before the bargain was concluded. The property had been listed for sale by John F. Anderson under an agreement by which the àgents were to receive all that they could obtain over $5 per acre. Subsequently, the vendor reduced his price to $4. We do not stop here to consider the contract for a sale to Sheridan, Green & Co., executed while the negotiations were pending, further than to say that the effect of that will be considered when we come to deal with the question of John F. Anderson's responsibility, as vendor, for the representations and frauds of O. J. Sheridan and those associated with him. The property was offered by Sheridan, Green & Co. to complainant at $7 per acre. This would make a commission or profit of $44,412 for the agents. To affect the conduct and action of A. J. Freer, the agent of complainant, Sheridan and Green and Lynn offered him one-third of the sum to be earned by the sale to Gen. Alger. This he accepted. The effort to show that he was given this interest, not to color his reports, but as blackmail demanded by him as the price for not actively advising against the purchase, is not even colorable. The distinction is not tangible. The fact remains that Freer was promised a share in the spoils in case a sale was made to complainant. When it was consummated he received $13,373.28 from Sheridan and associates, as the price of his services to them. Freer's report of the measurements of the exposed coal in the old Anderson entries was the report upon which complainant acted. That report he regarded as a verification of the representations made to him by Sheridan & Co. Now, it is satisfactorily shown that his measurements included interposing strata of slate and shale. Thus, one of the entries reported as showing a 48-inch vein of coal was made up of coal 12 inches, slate and shale 24 inches, topped with another vein of coal of 12 inches. This interposed slate is shown to have been premeditately painted by a wash of coal dust and water so that a casual observer would be misled. To prevent discovery by Shipman, the bottom of the entry at the breast of the vein was deepened so as to indicate that the vein was growing thicker. This was allowed

to fill with water, so that the exposed coal above the water extended presumptively to the bottom of the entry. The water was deliberately accumulated so as to prevent Shipman from discovering the artifice, and the vein was represented as extending to the bottom. By tricks and artifices Shipman was thus induced to rely upon Freer's statements as to thickness of that and other openings shown to him. By these diabolical schemes and artifices, the purpose of the complainant to verify the representations of the sellers' agents before buying was frustrated, and he thereby misled into paying a very high price for lands which have no great intrinsic value for either coal or timber. If the complainant investigated for himself, and nothing had been done to prevent his investigation from being as full and thorough as he desired, he could not say that he had purchased in reliance upon the representations of the sellers. Farrar v. Churchill, 135 U. S. 609, 615, 10 Sup. Ct. 771, 34 L. Ed. 246; Clark v. Reeder, 158 U. S. 505, 523, 15 Sup. Ct. 849, 39 L. Ed. 1070; Mining Co. v. Watrous, 9 C. C. A. 415, 419, 61 Fed. 163. But if a full and thorough investigation was prevented by artifice, practiced for the purpose of making the investigation illusory and the results misleading, it cannot be said that the vendor's responsibility for the truth of material representations is in any degree affected by the investigations thus rendered valueless by his own active intervention. So, if the agent of the buyer, intrusted to investigate and verify the seller's representations, collude with the latter, and thus betray his trust, no ground remains for failing to hold the seller to the most rigid responsibility for any sale induced by such practices. Any gratuity given to an agent of the buyer by the seller for the purpose of influencing the execution of his agency vitiates a contract which is subsequently made by the agent, as presumptively made under that influence, or subsequently made by the buyer himself, if in any material degree effected through the influence of the corrupted agent. City of Findlay v. Pertz, 31 U. S. App. 341, 13 C. C. A. 559, 66 Fed. 427. In this case we need not consider how far the option of rescission arises upon mere discovery of the corruption of an agent, independent of any actual damage to the principal. The fidelity of Freer to complainant was presumptively affected by the interest given him, dependent upon a sale consummated. That he concealed and misrepresented the facts, and actively aided in misleading and deceiving Shipman, who might have discovered the worthless character of the coal veins he sought to examine, admits of no doubt.

3. How far is John F. Anderson answerable for the representations and fraudulent devices and artifices practiced upon the complainant? The defendants say that Sheridan and Green were vendees under Anderson, and were dealing on their own account in selling this property, and that Anderson only made the deed because he held the legal title and at their direction. This property was placed in the hands of Sheridan and Green, as real-estate agents, by John F. Anderson, December 8, 1888. His agreement was to give them all they could realize over $5 per acre, as their compensation for finding a purchaser. Subsequently this was changed to all they could get over $4 per acre. December 10, 1888, Sheridan, Green & Co. prepared and

issued a circular offering the lands for sale, and mailed this to Gen. Alger, writing him at the same time. December 24th complainant replied, asking particulars, and saying he would send a man down to look at it, if it was not too late. Several letters followed. In one, of January 7, 1889, Sheridan, Green & Co. wrote that:

"The aggregate thickness of the three veins of coal is about fourteen feet when opened, and they become more heavy as they are developed. Three miles in a direct line from where one of the openings has been made, the outcropping is eleven feet thick, and about four thousand acres of land is underlaid with the vein."

In the same letter they said:

"You will ask, 'Why has it not been developed long ere this?' We reply that the owner has held it upwards of fifty years, and his pet hobby has been to develop it himself. * * * Were it not for the fact that the owner has to have the money, and that money is hard to command here, you could not purchase the land for $20 per acre."

January 9, 1889, complainant acknowledged receipt of above letter, and asked for "a legal refusal of this property," and, if it was as expected, he would take it. The price asked by these agents from Gen. Alger was $7 per acre. Just at this point in the negotiations, Sheridan, Green & Co. became apprehensive that their agency might be revoked or the price raised by their principal if he should discover the price they were about to obtain, and the large compensation they would thereby earn. To guard against this, they consulted counsel, and under his advice procured an option for 60 days at $4 per acre, agreeing to pay one-fourth cash within that time, and give lien notes for the remainder. For this option they offered $500, and to forfeit same if they did not make the cash payment within 60 days. Anderson accepted this proposition, and gave a title bond, obligating him to make title to them if within 60 days they paid one-fourth of the price in cash, and to make a deed and deposit it in escrow so soon as a survey could be made. He further agreed, that he "would not offer the land for sale to any person whatsoever, or tell the price at which I sold, until after the sixty days have passed." "I agree further to tell any person who may call to see me about the land, or write about it, that you have purchased it, and that I understand your price is ten dollars per acre."

The contention of defendants is that these agreements operated as a revocation of the former relation of agency, and that thereafter Sheridan, Green & Co. were acting for themselves, as the equitable owners of the land, and were no longer the agents of John F. Anderson for its sale. Conceding, for the purpose of the case, that a bona fide sale, by title bond, would operate as a revocation of any former relation of agency, as between the principal and his agent, such revocation would not be effectual as to third persons who continued to deal with knowledge of the original agency, and without knowledge of its revocation. The revocation of an agency does not take effect, as to third persons, until made known to them. "Persons who deal with an agent before notice of the recall of his powers are not affected by the recall." Hatch v. Coddington, 95 U. S. 48, 56, 24 L. Ed. 339, 341; Johnson v. Christian, 128 U. S. 374, 381, 9

Sup. Ct. 87, 32 L. Ed. 412. This is but an application of the known maxim of the law that, when one of two innocent persons must suffer, he shall suffer who by his own conduct or silence has misled the other. It is true that Gen. Alger did not at this time know who was the owner for whom Sheridan, Green & Co. professed to be acting at the date of this revocation. He did know, however, that they were acting only as agents for an undisclosed principal, who was the owner of the property. Who that principal was, was disclosed later, and while they still professed to be acting as his agents. Neither the option contract nor title bond was ever put to record, and neither was ever disclosed to complainant. During the subsequent investigations which complainant set on foot to verify the antecedent fraudulent representations of Sheridan, Green & Co., while confessedly the agents of John F. Anderson, complainant's agent, A. J. Freer, was corrupted; and his other agent, Shipman, was prevented from making any thorough examination by the artifice of flooding the entries. Being thereby induced to rely upon the statements of Freer and Sheridan, both of whom went with him to the coal openings, as to the thickness of the veins, he repeated to John F. Anderson, at his house, these representations, who then confirmed and adopted them by saying that he had worked two of the veins for 20 years, and that they were from "four and one-half feet, and upward," in thickness. More than this, when complainant, still later, sent his Michigan attorney, Col. John Atkinson, to Tennessee, to investigate the title, Atkinson was introduced by Sheridan to John F. Anderson as the owner. Anderson did not then, nor at any other time, disclose that he had theretofore sold the land to Sheridan and Green, but, on the contrary, proceeded to point out some of his corners and lines, and held himself out as owner and vendor. Col. Atkinson says upon this point that, while he does not recall any express statement by Anderson that he was the person selling the lands to Gen. Alger, "Anderson pointed out the lands which he said he owned, and which General Alger was purchasing, and I dealt with him as the seller. The deed ran from him to General Alger." The whole tenor of the evidence satisfies us that, from the inception of the negotiations to the delivery of the deed, Sheridan, Green & Co. held themselves out as the agents for the owner, and, before they were closed, introduced John F. Anderson as the owner whom they represented, and that John F. Anderson knew that they were so holding themselves out, and that he confirmed this by his silence, and his conduct in representing himself as the owner and seller for whom they were acting, both to Shipman and Col. Atkinson. Upon the whole of the evidence, we reach these conclusions: First. That Sheridan, Green & Co. were in no bona fide sense purchasers from Anderson of this property. They were impecunious, and confessedly had no intention to become the buyers. This, we are satisfied, John Anderson knew, and that he and they regarded and treated the option contract and title bond as a mere form of agency adopted to secure to the agents the control of the negotiations, and all that could be realized for the lands above $4 per acre. Doggett v. Emerson, 3 Story, 700, 7 Fed. Cas. 804; Mason v. Crosby, 1 Woodb. & M. 342, 16 Fed. Cas. 1016; Hough v.

Richardson, 3 Story, 659, 12 Fed. Cas. 566; Clark v. Reeder, 158 U. S. 505, 15 Sup. Ct. 849, 39 L. Ed. 1070. Second. If the title bond and option contract were good-faith transactions, they did not operate as a revocation of the previous authority of Sheridan, Green & Co. to sell as agents as to this complainant, because he was led by the conduct and silence of all parties to continue negotiations in the full belief that they were still acting for John F. Anderson as the owner and seller. Hatch v. Coddington, 95 U. S. 48, 56, 24 L. Ed. 339; Johnston v. Christian, 128 U. S. 374, 381, 9 Sup. Ct. 87, 32 L. Ed. 412. Third. The contract was one negotiated by Sheridan, Green & Co., assuming to be acting for John F. Anderson. He adopted the sale made by them, and whether they had been antecedently authorized to make the sale for him is of no moment. He accepted the benefits of the sale; made the deed as vendor and owner. He thereby ratified this act, and takes with the benefit all of the burdens. He thereby becomes responsible for any representations and frauds practiced by them by which the sale was induced. 2 Pom. Eq. Jur. 909; Mechem, Ag. 148.

4. Has the complainant, with knowledge of the fraud perpetrated upon him, elected to abide by the transaction notwithstanding the fraud? The deed was executed March 21, 1889. The complainant discovered the thinness of the coal veins, and the consequent worthlessness of the property for coal-mining purposes, as early as the summer of 1889. His deferred purchase-money notes matured in 1890, 1891, and 1892, and were paid as they matured. This bill was not filed until August, 1894,—something more than five years after the transaction. No statute of limitations has barred the suit, and none has been relied upon. The defense is that by the retention of the property, and the payment of the deferred purchase-money notes, the complainant has elected to hold onto his bargain. To avoid the prima facie effect of this delay in seeking rescission, the bill, in substance, avers that in purchasing the property complainant was misled and deceived by the reports of his agent, A. J. Freer, as to the coal deposits, and that he did not discover the corruption of this agent until the spring of 1894, and that he then caused this bill to be filed. The defendants deny this, and aver that he made the discovery of Freer's bribery shortly after he bought the property. Upon this issue a great mass of evidence has been submitted and upon this issue the result must turn. To prove knowledge and an election to stand by the bargain, defendants have relied, among other things, upon a letter from Gen. Alger, of March 21, 1889, to Sheridan, Green & Co., in which he said that he was "in receipt of a letter from your place informing me that the coal on the land I have purchased is not a regular vein, but is simply in pockets; that it has been proven so; and that it is notoriously known as being not a regular vein of coal, and that is the reason why it has never been worked. Of course, if I have been 'salted' in this way, I do not care to increase my investments there, but will let it stand and get out of it what I can." Complainant had not purchased this property alone, nor chiefly, upon the representations of the vendor and his agents. He had undertaken to verify their representations by an investigation. Freer pre-

tended to have gone into the entries and to have measured the exposed veins of coal, and his reports to complainant confirmed the statements made by Sheridan, Green & Co. The property had, therefore, been purchased upon the report of Freer, which confirmed all that had been represented. Having bought upon his own investigation, the option of rescission did not arise, unless his agent had been corrupted, or the investigation otherwise rendered deceptive and illusory by some active fraudulent conduct of the vendor. There is no pretense that at the date of this letter complainant had any reason to doubt the truth of Freer's reports confirming the specific statements of the vendor's agents in respect to the thickness of the veins, as exhibited in the vendor's entries. Neither did the discovery made by Shipman in the summer of 1889 as to the worthlessness of the property as a coal-mining property give complainant an option of rescission. Having bought upon his own investigation, he had no right to demand rescission unless it could be made to appear that that investigation had been made illusory through the fraudulent conduct of the vendor. Freer had for many years been his trusted agent in the examination of timber land for him, and complainant had reason for reposing absolute confidence in his honesty and integrity. Freer was not a coal miner. But it was reasonably supposed that he could measure the thickness of a vein of coal, and could be relied upon to do that with care, and to make a truthful report. Shipman was an expert. But his investigation was defeated, as we have elsewhere shown, by the fraudulent artifices of blowing up the bottom of the entries and flooding them so as to make access difficult, and give to the coal exposed the appearance of a vein extending from the bottom of the flooded entry. While his development work done in the summer of 1889 demonstrated that slate and shale were interposed between two thin veins of coal, and that coal, slate, and shale had been measured together as coal, yet he supposed, from confidence in Freer's integrity, that he had been simply misled into mistaking slate for coal, or careless in his measurements. This, too, was the view taken by complainant at that time. The means whereby complainant's investigation, through Freer and Shipman, had been frustrated, and a worthless property imposed upon him, did not come to light until long after the discovery of the thinness of the veins of coal. Until he should discover that his agents had been bribed or deceived by the fraudulent artifices of the vendor, complainant had no option of rescission. It is not for defendants to say that the vendee's confidence in Freer was misplaced, and that he should have sooner suspected his want of fidelity, and sooner discovered his treachery. Complainant knew that Freer was not an expert in coal mining. But he believed he was incorruptible. It was easy, therefore, to believe, as both complainant and Shipman did, that he had mistaken shale and slate for coal, and measured all together, until other facts came to light incompatible with an honest mistake. But not until much later did any of the facts come to light which indicated that confidence in Freer had been misplaced.

It is next sought to fasten constructive knowledge of Freer's brib-
ery upon complainant through the disclosures made in an equity
suit in the state chancery court, at Chattanooga, between O. J.
Sheridan and his partner, W. C. Green. Green and Sheridan fell
out over the money paid Freer, and Green claimed Sheridan was
wrongfully holding $13,377.28, received as part of the firm's share of
the sale to Alger. Sheridan claimed that this sum had been paid
to Freer for his services in selling Anderson's land to Gen. Alger,
and that the payment had been made with the knowledge and ap-
proval of Green. This Green denied. The facts were established
as claimed by Sheridan, who filed in that suit Freer's receipt for an
unnamed sum "in full of his interest in profits of the sale" to Gen.
Alger of the Anderson lands. Sheridan wrote to Gen. Alger about
this suit, and represented Green as claiming more than his share
of the spoils, but in no way intimated that the disagreement con-
cerned a payment made to his agent, Freer. None of the newspaper
notices of the suit disclosed this feature of the litigation, and neither
did the pleadings. The use which Sheridan had made of the money
which Green sought to have accounted for only came to light in the
evidence filed in 1890 and 1891. Complainant did not learn of the
facts thus disclosed by that litigation until 1894. He was not a
party to the suit, and is not, therefore, to be charged with construc-
tive notice. To the testimony of O. J. Sheridan that he in the sum-
mer of 1889 told Gen. Alger of his payment to Freer, and that the
general expressed his gratification that Freer had been thus gener-
ously dealt with, we can attach no importance. It is denied by Gen.
Alger with indignation, and is incredible in itself. Neither can we
attach any credit to Sheridan's evidence that he told Shipman of his
payment to Freer in May, 1889. The deposition in which this was
deposed to was taken in February, 1898. By stipulation it is agreed
that Shipman was then non compos mentis, and had been since 1897,
and that he died in February, 1898. Hence he could not be called
to show when and how he first learned of Freer's bribery. But in
1895 Shipman gave a deposition touching his development work done
in the spring and summer of 1889, in which he states that there was
nothing developed which indicated Freer's corruption, and that he
"told General Alger that he must have made a mistake and measured
the block bond for coal." This disposes of the effort to show that
Sheridan had in May previous told Shipman of his bribery of Freer.
But it is said that in March, 1890, Shipman learned of this matter
through a meeting between himself, Sheridan, Judge Moon, and oth-
ers, touching another land deal, in which Freer's treachery to Alger
was discussed, and the story related by some of those present, and
that this was made the basis for excluding Sheridan from any inter-
est in the new deal. It may be that Shipman there and then learned
of Freer's corruption, though the evidence is not clear or satisfactory.
But, if he did, his knowledge was not the knowledge of complainant.
His relation to complainant was limited to the single matter of in-
vestigating the coal deposits on this land before the purchase. Af-
terwards he was again employed in doing some development work
preparatory to mining operations. This latter matter was also con-

cluded long before March, 1890, and his agency for that purpose was at an end. Neither did he represent complainant in the proposed new deal for another body of lands, which Sheridan was endeavoring to engineer. Shipman, Milliken, and some others were, but not Gen. Alger. Gen. Alger had been solicited by Shipman to take an interest in the proposed new deal. He at once declined to have anything to do with any scheme in which Sheridan was concerned. Aside from any knowledge that Sheridan had bribed Freer, he had abundant reasons for such an attitude, in the worthless character of the lands which he had been induced to buy through Sheridan. It is possibly true that Shipman desired to get Sheridan out of the new deal, hoping that in such an event the general might be yet induced to try mountain lands again. Still, Shipman did not represent him; could not bind him by things he said or anything he should learn in his efforts to exclude Sheridan. Notice of facts to an agent is constructive notice to his principal only when it comes to the agent while concerned for his principal, and in the course of the very transaction, or so near before it that the agent must be presumed to recollect it. Notice after the agency has terminated will not, ordinarily, affect the principal. Nor is a principal bound by any subsequent narration of a past occurrence. "The reason is that the agent to do the act is not authorized to narrate what he had done, or how he had done it." Packet Co. v. Clough, 87 U. S. 528, 22 L. Ed. 406.

Evidence of declarations of an agent as to the past transactions of his principal are inadmissible, as mere hearsay. Goetz v. Bank, 119 U. S. 551, 7 Sup. Ct. 318, 30 L. Ed. 515. But it is said that at some time Gen. Alger did learn from Shipman the fact of Freer's bribery. This he admits in his second deposition. But when was this? The complainant in 1893 employed Col. John Atkinson to investigate his title and bring suit to obtain a rescission, upon the ground that the vendor had knowingly and fraudulently included lands in his deed to which he had no title, or, failing rescission, to obtain relief upon the covenants of the deed. For the purpose of starting such a suit, the firm of Marks, Fitzpatrick & Lynch, lawyers, in Franklin county, Tenn., were retained by Col. Atkinson. The deed did not show a sale by the acre. To ascertain the facts in this respect, Judge Moon, at Chattanooga, was consulted, as probably having knowledge. He advised counsel of the suit between Sheridan and Green, and that they should examine that record. This was done in April, 1894. Freer's want of fidelity was then disclosed, and a synopsis of the evidence was prepared and submitted to Ex-Gov. Sherwood, the local agent for complainant. This was May 11, 1894. This document was placed in the hands of Col. Atkinson by Sherwood, and communicated to Gen. Alger by Col. Atkinson. Col. Atkinson testified that this was the first information which reached him of Freer's treachery, and that when he communicated it to Gen. Alger the latter refused to credit it, until a photograph copy of Freer's receipt, filed in the case of Sheridan v. Green, was shown him, and that thereupon this bill was filed so soon as it could be prepared. Much comment has been made upon the vague-

ness and uncertainty of Gen. Alger in this matter of the date when he acquired knowledge of Freer's treachery. It must be admitted that Gen. Alger is not what lawyers call a "good witness." We do not know that this is to his discredit. His memory of dates is bad. He admits it, and his whole evidence indicates it. It appears in matters about which he could have had no interest in simulating. Thus, the date when Col. Atkinson learned of Freer's bribery, how he acquired his knowledge, and the date when he communicated this knowledge to Gen. Alger, is a date fixed almost to a demonstration by the testimony of Mr. Roy Fitzpatrick, of Winchester, Tenn., and that of Col. Atkinson himself. Still, Gen. Alger was quite uncertain as to the year when Col. Atkinson had come to him with the synopsis of the evidence from the record in the suit of Sheridan v. Green, and the photographic copy of Freer's receipt, filed in that suit. We acquit him of all intentional concealment, and credit him with an exhibition of conscience, which, under temptation, refused to be certain about dates. The explanation is, in part, that the complainant was a man of many affairs, and was in the habit of intrusting their management and details to agents. He depended upon their vigilance, their fidelity, their memories, and did not burden himself with details. This Anderson deal he placed in the hands of his attorney, Col. Atkinson, when he found reason to believe that his title was defective, and there he left it. This, we deduce from his evidence, is a just explanation of this inattention to dates. The sum of all to be deduced from his two depositions is this: That both Shipman and Col. Atkinson talked to him about the bribery of Freer. He cannot be certain whether he was first told of it by Shipman or Atkinson, but probably the latter, though their communications came to him very closely together. When this question became important in the course of the evidence, Shipman was incapable of testifying, as we have before explained. But for this misfortune, we might have had a statement as to when and how he first learned of Freer's treachery. The point is, however, sufficiently cleared by the evidence of Col. Atkinson, who states that he informed Gen. Alger of the disclosure appearing in the suit of Green v. Sheridan in May, 1894; that complainant then manifested surprise, and refused to credit the story until confronted with a photographic copy of Freer's receipt, taken from that suit. We conclude, upon all the evidence, that this was the first knowledge which came to complainant which gave him the right to elect whether he would rescind the contract of sale or abide by his bargain.

In the case of Mining Co. v. Watrous, 9 C. C. A. 415, 61 Fed. 163, 186, we had occasion to consider the kind of knowledge which is necessary to put a vendee to an election. We then said:

"When a purchaser acquires knowledge that he has been defrauded, he has an election of legal remedies. He may keep the property and sue for damages, or repudiate the contract and demand rescission. These remedies are not concurrent, but inconsistent, and the adoption of one of necessity excludes the other. The rule is well settled in equity that after knowledge of the fraud the party must, within reasonable time, make an election as to whether he will affirm the trade, notwithstanding the fraud, or offer to restore the property and demand the return of his purchase money. If, after the knowledge of the

facts which entitle him to rescind, he deal with the property as owner, it is evidence of acquiescence, and an affirmance of the contract."

In that case, as in this, the vendee at an early day learned that he had made a prodigiously bad bargain, and that things were not as had been represented. In that case, as in this, the property had been bought after an investigation which seemed to verify the representations of the seller. In that case the agent of the buyer took his own samples from places of his own selection in the silver mine which was the subject of the sale, and the property was bought upon the result of an analysis of the samples thus taken. The mines soon proved worthless. But no right of rescission arose unless the samples had been "salted" by the vendor so as to make them nonrepresentative of the ores of the mines. Until evidence that the samples had been tampered with by the vendors could be secured, there was no ground for filing a bill for rescission. We said:

"Without evidence that his samples had been tampered with by defendants, he had no knowledge of facts entitling him to rescission. Knowledge of their guilty complicity in the intrusion of metallic silver was and is the knowledge upon which the option of rescission arose."

We also said:

"Neither rumors nor suspicions required an election. Either would demand diligence in effort to discover the truth, for, after facts are known, calculated to excite suspicion, laches would be imputed if there was negligence in inquiry."

This is the law applicable to the case in hand. Knowledge that the investigation undertaken by complainant had been thwarted by the fraudulent artifices of the vendor was the knowledge upon which the option of rescission arose. It is not made clearly to appear just at what stage of the negotiations Freer was corrupted. Most likely it occurred between his two visits to the property. It is not impossible that on his first inspection of the old openings upon the property he was deceived by the painted slate, and ignorantly measured a stratum of slate or shale with two thin veins of coal, one above and one below the shale. It is also possible that his corruption came about through his own initiative after the first inspection and after his first report to Gen. Alger. But all of this is immaterial if before the conclusion of the purchase he was given an interest which was in conflict with his duty to Gen. Alger. One thing is clear: He was bought before his second inspection of the property. Whether he then discovered the artifice by which his former investigation had been thwarted, if in fact he had ever been deceived, is not vital. He might have done so if his fidelity had not been in the meantime shaken. Gen. Alger was thereby deprived of the vigilant observations of an honest agent, and through confidence in him the discoveries which might have come from a thorough investigation by Shipman, who was an expert, were in all probability completely thwarted. In such a situation the right of rescission arose when it was discovered that the inspection and investigation which complainant undertook to make, and upon which he relied, had been frustrated by bribery and other fraudulent schemes adopted to make such investigation worthless. That he did not discover the facts

which entitled him to rescission sooner is in part due to the fact that complainant resided in a distant state, and in part to the secret and pernicious character of the frauds perpetrated upon him. His confidence in Freer was known. Advantage of that was taken. His loyalty to and faith in Freer were only shaken when confronted with his receipt. The case is one of actual fraud, involving deep moral turpitude. Neither is it one in which the vendor's liability is purely constructive, for there are circumstances tending to show that the vendor was to some extent aware of the artifices resorted to in dressing up the entries to present a false appearance, though he was probably unaware of the bribery of Freer. In such cases courts of equity will look with some indulgence when the defense is laches or acquiescence, and require very clear evidence that the defrauded party has assented after full knowledge of the fraud and his rights in the matter. McIntire v. Pryor, 173 U. S. 38, 43, 19 Sup. Ct. 352, 43 L. Ed. 606; Saxlehner v. Eisner & Mendelsohn Co., 179 U. S. 19, 21 Sup. Ct. 8, 45 L. Ed. ——. The evidence does not satisfy us that there has been either such laches in discovering the fraud, or such an election to abide by the bargain after full knowledge of the facts upon which the option of rescission depended, as should now prevent full relief.

5. We now come to the question of the liability of the defendant John W. Gonce. One of the tracts of land included in the deal of John F. Anderson to the complainant was a body of between 4,000 and 5,000 acres, known as the "Gray Grant." This tract in 1888 was owned by John F. Anderson, John W. Gonce, and others, as tenants in common. For the purpose of partition it was sold under a decree of the chancery court for Franklin county, and bought by John W. Gonce, to whom the sale was confirmed. At the sale there was an agreement between Gonce and Anderson that the latter might share in the purchase to the extent of one-fourth, upon paying that proportion of the cash payment required by the decree of sale, and of each of the deferred purchase-money notes to be executed by Gonce. John F. Anderson was the grandfather of John W. Gonce, and they were near neighbors. Anderson neglected to avail himself of his right to join in the purchase, but claimed to be the equitable owner of a one-fourth interest in this land, subject to the payment of one-fourth of the price which Gonce was to pay, and for which Anderson was bound as Gonce's surety upon his purchase-money notes. When Anderson listed his own lands for sale with Sheridan, Green & Co., he probably included this Gray tract, though this is not clear. January 11, 1889, when he gave to Sheridan, Green & Co. the option contract before mentioned, he included this Gray tract in the description of those lands which he obligated himself to sell to them if they should exercise the option of buying. John W. Gonce denies that he ever authorized his grandfather to thus list his interest in this land with Sheridan, Green & Co., or that he ever authorized its inclusion in the option contract or title bond given them; and there is no evidence whatever justifying us in finding that either act was done by any arrangement, agreement, or understanding between them. Some time after this had been done,

Gonce learned, through A. J. Freer, who was inspecting the Anderson lands for complainant, that the Anderson title bond included the Gray land. He at once told Freer that this was without authority, and that the land was his, and was not for sale. This was repeated to Sheridan, who at once visited Anderson and demanded an explanation, and was assured that Gonce, as a grandson, would ratify his action. Gonce was sent for, and urged to allow this land to go into the proposed sale to Sheridan, Green & Co. He did not prove as manageable as anticipated. Sheridan threatened to hold the old man liable upon his title bond if he did not straighten the matter out. Thereupon the grandmother joined in appealing to Gonce to protect his grandfather. He refused absolutely to adopt anything his grandfather had done, but did agree to sell to his grandfather his interest at $4 per acre, and gave a written contract to John F. Anderson obligating himself to make him a quitclaim deed if within 40 days he should elect to buy and pay one-fourth cash; balance, with interest, in one, two, and three years. This contract was made and delivered February 8, 1889. Gonce testifies that he then supposed that Sheridan, Green & Co. were dealing with John F. Anderson as buyers for themselves, and had no intimation that they were negotiating with complainant as agents for John F. Anderson, or otherwise, and that he did not know that complainant was the real purchaser until he was called upon to make a deed, as he was obligated to do by his contract with John F. Anderson. When the sale to complainant was being concluded, Anderson, in order to perfect his own title, as he was bound to do, demanded a quitclaim deed from Gonce. The controversy between Anderson and Gonce as to the interest owned by Anderson in the Gray land under the agreement between them for a joint purchase was adjusted by an agreement that Anderson should pay $4 per acre for a three-fourths interest, and $1 per acre for the remaining fourth, and that Gonce should be secured in his purchase money by placing his deed in escrow, to be delivered to complainant when a deposit should be made with the bank of the cash part of the payment due Gonce, and of one of complainant's purchase-money notes, indorsed by Anderson, which note should be held until collected, and enough of the proceeds applied to pay off the deferred payments going to Gonce. As Gonce had not obtained the title from the court under whose decree he had purchased the land, he included in his deed to John F. Anderson a direction to the court that the title should be made to complainant, being then advised that complainant was the assignee of John F. Anderson. Gonce's deed to Anderson is dated March 11, 1889; and Anderson's, including the same land, to complainant, was executed March 21, 1889. There is no evidence implicating Gonce in any of the frauds, artifices, or misdeeds of either John F. Anderson or his agents, Sheridan and Green. There were no coal entries or openings upon the Gray land, and no representations are shown to have been made by Gonce in respect to either that tract, or any of the lands sold by John F. Anderson to the complainant. Gonce is shown by the evidence to have been indisposed to sell his lands, and there is nothing to indicate any kind of concert with his grandfather in any of the

dealings culminating in the sale to complainant, other than his reluctant agreement to sell to him, and the arrangements concerted for the security of the price he was to receive from him. It is clear, from all the evidence, that Gonce has been guilty of no fraudulent conduct whatever; and if he is to be held liable in aid of John F. Anderson, to the extent that he received purchase money, it must be upon the ground that, as an inference of law, the relation of agent and principal existed between Gonce and John F. Anderson, or Sheridan and Green and Gonce, and that he is therefore liable for their acts and misdeeds. It cannot be, and we do not understand the learned counsel for complainant to so contend, that the fact that the owner of land executes an option contract or makes a title bond constitutes the option or title-bond holder, per se, the agent of the owner. Sales by option contract and title bonds are common modes of sale in Tennessee, and if the transaction be what it purports to be, and not a mere cover for an actual agency, there is no solid ground for holding that by such a contract the relation of principal and agent is created. Neither does the mere fact that the option contract is given by one tenant in common to another affect the legal relation, if the transaction be not colorable. Nor is the principle different if the option be given with expectation that it may be assigned before it expire. Such an obligation does not constitute the option holder, per se, the agent of the owner, and whatever passes between him and a stranger is res inter alios acta, unless there be other circumstances making the owner liable. Complainant's counsel have cited and relied upon the cases of Clark v. Reeder, 158 U. S. 505, 15 Sup. Ct. 849, 39 L. Ed. 1070; Daniel v. Mitchell, 1 Story, 172, Fed. Cas. No. 3,562; Doggett v. Emerson, 3 Story, 700, Fed. Cas. No. 3,960; and Mason v. Crosby, 1 Woodb. & M. 342, Fed. Cas. No. 9,234. In none of these cases is there any support for the theory that an option holder or a title-bond holder is per se the agent of the owner. In Daniel v. Mitchell, cited above, Todd, the holder of the title bond, had also an agreement that he should sell the land, and receive one-half of the excess over $4 per acre if he should succeed in making a sale. He made a sale, and the deed was made direct by the owners, who held the legal title. All of the owners were held liable in aid of Todd, against whom a decree went as having received all of the purchase money, from his having acted as their agent in making the sale. The case is sound. The title bond was, in substance, a mere agency. That it was so appeared from the agreement tacked on, that Todd should sell and be compensated by the excess over a given price. He therefore sold for the owners, and was their agent. In Doggett v. Emerson, cited above, Emerson, acting for himself and others owning land, gave to Williams a title bond, agreeing to make title on being paid a stipulated price per acre. Williams made a sale, and Emerson and associates caused a deed to be made by the state direct to the purchaser. Williams made untrue representations. The owners were made liable for his misconduct, upon the ground that the evidence showed that the real relation was that of principal and agent, and that the object was to conceal the agency of Williams, and give him

all he could realize over a fixed price. In Mason v. Crosby, 1 Woodb. & M. 342, Fed. Cas. No. 9,234, the facts were much the same as those in Doggett v. Emerson. Upon the extrinsic evidence, Justice Story found that the title bond given Fifield was intended as a mere form of agency. All these cases cited go upon the solid ground that, if the facts show that the option or title bond was in substance a mere authority to sell for the owner, the mere form of the transaction will not change the true relation between the parties. Such an option contract was given by John F. Anderson to Sheridan and Green. But upon all of the evidence we reached the conclusion that it was a mere form of agency, and that the relations, therefore, existing were not, in substance, changed. It was, as we conclude, intended that Sheridan and Green should sell the lands for Anderson, the option agreement and dependent title bond being a mere form for securing to them all they could realize over an agreed price. All of the occurrences subsequent thereto seemed to bear out this deduction. The case against John W. Gonce is plainly distinguishable upon the evidence in this transcript. We are not satisfied that his agreement to sell his interest in this Gray land was colorable, or other than what it purported to be on its face. Nor do any of the occurrences subsequent to its execution justify the contention that he adopted the sale of his land as one made by Anderson for him.

The decree of the circuit court must be affirmed so far as it refused relief against John W. Gonce, but reversed so far as it denied the relief of rescission. The costs of appeal will be divided between complainant and the executrix of John F. Anderson, the latter paying three-fourths of the whole. The case will be remanded for further proceedings not inconsistent with this opinion, when the costs below may be taxed as the court shall adjudge.